546 So.2d 1246 (1989)
STATE of Louisiana
v.
Joseph COLLINS and Robert Magee.
No. 88 KA 1297.
Court of Appeal of Louisiana, First Circuit.
June 20, 1989.
*1249 Warren J. Daigle, Jr., Asst. Dist. Atty., Houma, for plaintiff and appelleeState of La.
Stuart J. Dornan, Indigent Defender Bd., Houma, for defendants and appellants Robert Earl Magee and Joseph Collins.
Before CARTER, LANIER and LeBLANC, JJ.
CARTER, Judge.
Defendants, Joseph Collins and Robert Magee, were each charged by a single bill of information with armed robbery, violations of LSA-R.S. 14:64. At trial, the jury found defendants guilty as charged. Defendants were subsequently charged, pursuant to LSA-R.S. 15:529.1, as felony habitual offenders. The trial court found that Magee was not a habitual offender and sentenced him to imprisonment at hard labor for a term of ninety-nine years, without benefit of parole, probation, or suspension of sentence and with credit for time served. Collins was adjudged a second felony habitual offender and was sentenced to imprisonment at hard labor for a term of 198 years with credit for time served.[1] Defendants appealed, urging thirteen assignments of error:
1. The trial court erred by denying defendants' challenges for cause as to eight prospective jurors.
2. The trial court erred by denying Robert Magee's motion to quash the grand jury indictment and bill of information filed against Magee with prejudice based upon the violation of Magee's statutory and constitutional rights to a speedy trial.
3. The trial court erred by denying defendants' motion to suppress their identification from a photographic lineup.
4. The trial court erred by refusing to allow witness Ray Fletcher the right to examine a prior statement to refresh his memory.
5. The trial court erred at the suppression hearing and during trial by refusing to allow defense counsel to question *1250 state witnesses concerning the reliability of an identification made by the witnesses.
6. The trial court erred by refusing to permit defense counsel to question witnesses about a separate related "photographic lineup" identification of individuals allegedly involved in the instant offense with defendants.
7. The trial court erred by commenting on the facts of the case in the presence of the jury.
8. The trial court erred by refusing to allow the jury to examine prior inconsistent statements, made by state witnesses, which were exculpatory Brady material.
9. The trial court erred by allowing the prosecutor during closing argument to state that neither defendant worked for a living.
10. The trial court erred by failing to quash the multiple offender bill of information charging Collins as a multiple felony offender and by sentencing Collins as a multiple felony offender.
11. The trial court erred by denying defendants' motion for post verdict judgment of acquittal.
12. The trial court erred by denying defendants' motion for a new trial.
13. The verdicts were contrary to the law and the evidence.
The record reveals that the instant offense occurred on May 7, 1985, shortly after 5:00 p.m. at the Main Street Branch Office of Fleet Finance in Houma, Louisiana. Present at the time were Ray Fletcher, Lila Duplantis, Elisa Bagwell and Ms. Jane Doe,[2] employees of Fleet Finance. Mrs. Bagwell's, husband, Jerry, and their four-year-old son, Jared, were also present at the time of the offense.
Four perpetrators armed with guns entered Fleet Finance and demanded money. Mrs. Bagwell testified that a fifth individual was also involved, but that this individual merely stood at the door and did not enter the building. The victims were ordered not to look at the perpetrators, and the victims apparently heeded that order.
The victims were made to lie on the floor. Mrs. Bagwell knelt down and positioned herself over her young son in an effort to calm and protect the child. Because Mrs. Bagwell suffered from scoliosis of the spine, she could not lie as flat as she might otherwise have and remained on her knees. In that position, she could see what was happening. According to Mrs. Bagwell, Magee, and Collins, or one of them, raised Ms. Doe's skirt, apparently to rape her. One of the other perpetrators told them to go into the storage room in the back of the office.
In the meantime, the other victims were told to stand and go into the back office. Fletcher and Duplantis got up and went to the back office. Mr. and Mrs. Bagwell also went to the back office, taking their son with them. On the way to the back office, Mrs. Bagwell observed that the lights were on inside the storage room. Through the partially open door leading to the storage room, Mrs. Bagwell observed that Ms. Doe was in there. However, Mrs. Bagwell could not see who else was inside, and the door was then pulled shut. In defense exhibit (D-6), a written statement Ms. Doe gave to Houma City Police Detective Patrick Babin shortly after the instant offense, Ms. Doe disclosed that one of the perpetrators raped her in the storage room. According to Duplantis, Ms. Doe was the last victim brought to the back office where the other victims were. The victims were again made to lie on the floor. The robbers closed the door to the back office and told the victims not to move. Thereafter, the victims summoned the police.
The record reveals that the robbers took approximately two thousand dollars from Fleet Finance. Additionally, personal property, including money and jewelry, were taken from the individual victims during the commission of the offense.
A single pre-trial lineup procedure involving defendants (a nine-picture photographic *1251 lineup which included defendants' pictures) was conducted on June 5, 1985. Of those who viewed that lineup, only Mrs. Bagwell made an identification. She selected the photographs of both defendants as depicting two of the robbers. Later, at trial, she made in-court identifications of both defendants.
Prior to the June 5 photographic lineup, a live lineup (that did not involve either defendant) had been conducted on or about May 29, 1985, in Thibodaux. At that lineup, Mrs. Bagwell identified John Stevenson and Donald Robinson as two of the perpetrators of the instant offense.
ASSIGNMENT OF ERROR NO. ONE:
By means of this assignment, defendants claim that the trial court erred by denying their challenges for cause of prospective jurors Donald Bourg, Dorothy Bergeron, Harriet LeBlanc, Althea Pellegrin, Donald Kinnard, Charles Duet, Jackie Gathen, and Keith Trahan. The record reflects that, following the denial of the defendants' challenges for cause of each of those prospective jurors, defendants used a peremptory challenge to exclude the prospective jurors from service on the jury. Based upon various responses given during the voir dire testimony of these prospective jurors, defendants argue various bases for the alleged erroneous denials of their challenges for cause. Our review of those responses and bases follows.

RELATIONSHIPS TO THE PROSECUTOR
Donald Bourg, Dorothy Bergeron, Harriet LeBlanc, Althea Pellegrin, and Donald Kinnard each testified as to a relationship each had with District Attorney Douglas Greenburg or Assistant District Attorney Warren Daigle. Bourg stated that he was acquainted with Mr. Greenburg and that the two are friends. Bourg, however, gave his assurances to the court that his friendship with Mr. Greenburg would not influence him. Bourg also made clear that the fact Mr. Daigle works for Mr. Greenburg would not influence him in any way and that he could give defendants "fair and square" treatment. Dorothy Bergeron testified that Mr. Daigle is a customer of a drugstore where she works. According to Bergeron, the fact that she knows Mr. Daigle and that he is a customer at the drugstore did not create any presumption in Mr. Daigle's favor or give him any advantage over defendants. In sum, Bergeron stated that she would accord defendants "fair and square" treatment and that her relationship with Mr. Daigle would not influence her in any way. Harriet LeBlanc's testimony revealed that Mr. Daigle had previously represented her in an adoption matter. However, LeBlanc stated that her prior professional relationship with Mr. Daigle would neither give him an advantage nor influence her in any way. LeBlanc emphatically stated that she could treat defendants fairly and give them a fair trial and that, if the state failed to prove defendants' guilt, she would not be inclined to vote guilty because she knew Mr. Daigle. In regard to the testimony of Althea Pellegrin, defendants claim that Pellegrin disclosed that she knows Mr. Douglas Greenburg's mother. However, in reviewing Pellegrin's testimony, we found no testimony of Pellegrin that she knew Mr. Greenburg's mother. In any event, Pellegrin's testimony revealed that she knew Mr. Greenburg and that he was an acquaintance of one of her children. However, Pellegrin stated that those facts meant nothing to her and did not give rise to any advantage for either Mr. Greenburg or Mr. Daigle. Pellegrin testified that she would give defendants a fair trial. Finally, Donald Kinnard testified that he and Mr. Daigle attended high school together. Since then, Kinnard and Mr. Daigle have associated with one another through social organizations, e.g., carnival clubs. Kinnard stated that he and Mr. Daigle are friends, but that their relationship would not influence him in any way or give Mr. Daigle any advantage. Kinnard stated that he would give defendants a fair trial and that, if Mr. Daigle failed to prove defendants' guilt, he would render verdicts of not guilty, notwithstanding his relationship with Mr. Daigle.
The state or the defendant may challenge a prospective juror for cause on the *1252 ground that a relationship by blood, marriage, employment, friendship, or enmity between the juror and the district attorney is such that it is reasonable to conclude that the relationship would influence the juror in arriving at a verdict. LSA-C.Cr.P. art. 797(3). Contrary to defendants' assertions in brief, we are unable to say that the refusal to exclude Bourg, Bergeron, LeBlanc, Pellegrin, or Kinnard for cause was an abuse of the discretion granted to the trial court in its determination of whether the relationship between the prospective juror and the district attorney would influence the juror in arriving at a verdict. See State v. Carthan, 377 So.2d 308 (La.1979).

RIGHT TO SILENCE/PRESUMPTION OF INNOCENCE
Defendants claim that, in response to questioning regarding their Fifth Amendment privilege against self-incrimination, Donald Bourg's response disclosed Bourg had a preconceived notion that defendants had to prove their innocence. Defendants conclude that Bourg was not impartial and that Bourg's notion deprived them of their presumption of innocence. Defendants also assert that Dorothy Bergeron, Harriet LeBlanc, and Althea Pellegrin each indicated they could not presume defendants were innocent, indicating their partiality against defendants. Additionally, defendants assert that LeBlanc indicated that, if they were not guilty, defendants should take the stand in their own defense.
The record reveals that, during his voir dire examination, prospective juror Steven Legendre was questioned in regard to defendants' presumption of innocence. Legendre testified that he thought there was doubt as to whether or not defendants were guilty or not guilty. Although Legendre stated that he understood defendants had the benefit of a "cloak of innocence" surrounding them, he did not think defendants were necessarily innocent or necessarily guilty until he would know more about the charged offense. In any event, Legendre concluded that he could not say defendants were innocent. At that juncture of the voir dire examination, Dorothy Bergeron remarked that she felt the same way as Legendre. Althea Pellegrin stated that defendants would have to be proven guilty before she would say they were guilty, but that she still had a problem with defendants' "cloak of innocence." Harriet LeBlanc stated that she had a problem presuming the defendants' innocence, and, in regard to defendants' privilege against self-incrimination, LeBlanc stated that she felt defendants would want to defend themselves during trial. She stated: "It's something serious, and if they're not guilty, they should take the stand." Similarly, Donald Bourg, questioned defendants' "code of silence," stating that he thought defendants might want to prove their innocence.
After all of the above testimony had been elicited through defense counsel's questioning, the trial court began further instruction and inquiry of Bourg, LeBlanc, Bergeron, and Pellegrin, all of whom were members of the first panel of prospective jurors. Initially, the court explained to Bourg that, under the state and federal constitutions, no one can be compelled to be a witness against themselves. Thus, a defendant, for whatever reason, does not have to take the stand. Bourg stated that he understood the foregoing, that he would not expect defendants to take the stand, and that he would not hold their failure to take the stand against them. The court further explained to Bourg that not only did defendants have the right to refuse to take the stand, but that they did not have to defend themselves by presenting evidence or even lifting a finger in their defense. The court stated that defendants were entitled under the state and federal constitutions to rely on their presumption of innocence. Bourg stated that he would accord defendants their constitutional rights.
LeBlanc testified that she understood the court's instructions to Bourg that defendants do not have to do anything in their own defense, that defendants had the choice as to whether or not to take the stand, and that their failure to take the stand could not be held against them. LeBlanc *1253 stated that she would not require of defendants more than the law required of them. The court instructed LeBlanc as to a defendant's presumption of innocence and explained it exists until it is overcome by the state's proof of guilt beyond a reasonable doubt. LeBlanc acknowledged that the state had the burden of proving defendants guilt and that, if the state failed to meet its burden, she had to find defendants not guilty.
The court instructed Bergeron that anyone can be accused of a crime, that an accused is presumed innocent, and that not until the state presents evidence of guilt beyond a reasonable doubt would she be free to form an opinion of guilt. Bergeron acknowledged that she understood those instructions and could follow them.
Pellegrin explained that she had had a "gut feeling about [defendants] being here [on trial]" but that she understood someone could be unjustly accused. Thus, she disagreed with the defense position that she had any problem with defendants not taking the stand or their presumption of innocence. Pellegrin stated that she knew defendants had the presumption of innocence and that, in accordance with the law and her oath, she would give defendants the benefit of that presumption. Pellegrin stated that she understood defendants were not required to prove anything, that they had the right to remain silent, and that she would not hold that against defendants. Furthermore, Pellegrin testified that she understood the state had to prove defendants' guilt and that, absent such proof, defendants were not guilty.
The circumstances surrounding defendants' challenges of these prospective jurors for cause are analogous to the circumstances in which a juror has voiced an opinion seemingly prejudiced to the defense, but subsequently, upon further inquiry or instruction by the court, has demonstrated a willingness to decide the case impartially, according to the law and evidence. See State v. Sims, 529 So.2d 454 (La.App. 1st Cir.1988), writ denied, 532 So.2d 764 (La.1988); State v. Glaze, 439 So.2d 605 (La.App. 1st Cir.1983). Hence, the trial court did not abuse its discretion by denying these challenges for cause.

RELATIONSHIP TO A LAW ENFORCEMENT OFFICER
Defendants urge that the trial court erred by denying their challenges of prospective jurors Charles Duet and Jackie Gathen because both of their fathers were employed by law enforcement agencies in Terrebonne Parish. Defendants assert it is reasonable to conclude that, if such a juror did not render a guilty verdict, his father would face tremendous embarrassment among his fellow employees.
In State v. Lewis, 391 So.2d 1156 (La. 1980), the Louisiana Supreme Court held that:
[S]ervice on a criminal jury by one associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause, although such association does not automatically disqualify a prospective juror. [391 So.2d at 1158]
It is well settled that relationship to a law enforcement officer is not of itself grounds for a challenge for cause. Rather, the question presented is whether the prospective juror could assess the credibility of each witness independent of his relationship with members of law enforcement. The trial court is afforded great discretion in making this decision, and its ruling will not be overturned absent an abuse of that discretion. State v. Heard, 408 So.2d 1247 (La.1982).
Charles Duet and Jackie Gathen disclosed during voir dire examination that their fathers were Terrebonne Parish deputy sheriffs. Duet testified that the fact his father was a police officer would not influence him, and he would make his own decision in the case based on the evidence and not the fact that his father was a deputy. Hence, the trial court concluded Duet could be a fair and impartial juror.
Jackie Gathen testified that the fact his father was a police officer would not cause him to be prejudiced in any way as to the defendants. During further questioning, Gathen testified that his father's occupation would not cause any problem in Gathen's *1254 sitting fairly and ably as a juror and rendering a fair verdict.
Based upon our review, we cannot disagree with the trial court's conclusions that these prospective jurors would be fair and impartial jurors. Accordingly, we find no abuse of the trial court's discretion. See State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985).

INABILITY TO CONCENTRATE
Defendants assert that prospective juror Keith Trahan indicated he would have difficulty concentrating on the trial because of time missed from work and subsequent wage loss, which would be an infringement upon his ability to support his family. They argue that Trahan's alleged inability to concentrate was an infringement upon their right to a fair trial.
During the prosecutor's questioning of the second panel of prospective jurors, Keith Trahan stated that his sitting as a juror was difficult because he would miss work, making it hard for him to pay his bills. Thereafter, the following exchange occurred:
MR. DAIGLE [the prosecutor]: Most people don't envy you all, okay? Most people would rather be at work, or doing whatever they do in the course of the day. Unfortunately, it goes with the territory, because it's a duty that we have to perform. The bottom line is: I know you're going to be concerned about your business, but are you going to be so concerned that you're not going to pay attention to the people that are testifying, and that you're not going to give these guys a fair trial. In other words, are you going to be so concerned about that, that you can't concentrate on this?
MR. TRAHAN: I'll do what I have to do.
Again, later during defense questioning of the panel, the following exchange took place:
MR. DORNAN: Does anybody have a problem? Does anybody have a feelingthey've got to be here for something. Does anybody think that? Please be truthful. I know it's something thatif you feel that way, please, I beg of you, say it. Tell me. Be honest. Mr. Trahan, said yes, I've got a problem; I've got to work; I've got to support my family. Mr. Trahan, do you have a problem with that today?
MR. TRAHAN: No.
MR. DORNAN: No? Anybody at all?
. . .
In denying defendants' challenge for cause of Keith Trahan, the trial court concluded Trahan's responses during questioning by the state and the defense disclosed that, despite any work-related problem Trahan had expressed, Trahan's answers evidenced his willingness to be receptive to the evidence and to decide the case based on the evidence. We find no abuse of discretion.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. TWO:
By means of this assignment, Magee argues that the trial court erred by denying his motion to quash the bill of information charging the instant offense and a separate grand jury indictment charging him with aggravated rape, which allegedly occurred during the instant offense. Magee's argument is based on his claim that, under Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), his constitutional right to a speedy trial was violated.
The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by Article 1, § 16, of our state constitution. The right attaches when an individual becomes an accused, whether by formal indictment or bill of information or by arrest and actual restraint. State v. Sweeney, 443 So.2d 522 (La.1983). In determining whether or not this constitutional right has been violated, no fixed time period is determinative. Rather, a balancing process is utilized in which the conduct of both the prosecution and the defense is viewed in light of several factors: the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the *1255 defendant. Barker v. Wingo, supra; State v. Dewey, 408 So.2d 1255 (La.1982). The initial inquiry is into the length of the delay, and if the delay is presumptively prejudicial, there will be an inquiry into the other factors. The length of delay that will provoke such an inquiry is dependent upon the peculiar circumstances of the case. State v. Dewey, supra.
In Barker v. Wingo, supra, the Supreme Court stated the following:
We regard none of the four factors identified above as either a necessary or sufficient condition to the finding or a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. (footnote omitted; emphasis added) [92 S.Ct. at 2193.]
The instant offense and the other charged offense of aggravated rape arose out of the same criminal episode at Fleet Finance on May 7, 1985. Magee was charged with the instant offense by bill of information filed on November 5, 1985. On the same day Magee was charged with the instant offense, a bench warrant was issued for his arrest for that crime.
Thereafter, as per the official minute entries of the district court, on January 12, 1987, the court appointed an attorney to represent Magee as to the instant offense and the aggravated rape charge. On January 29, 1987, Magee was arraigned and entered pleas of not guilty to both charges. On April 13, 1987, on the motion of the state, trial of both charges was continued to September 14, 1987. On September 14, 1987, again on motion of the state, the trial was continued to February 24, 1988.[3]
Magee filed a motion for speedy trial on January 11, 1988. On that same date, he filed a pleading styled an "Application for Bill of Particulars Discovery and Oyer." On February 3 and 5, 1988, Magee filed motions to quash, each of which included an allegation that his constitutional right to speedy trial (as to the instant offense and the aggravated rape charge) had been violated.
A hearing on the allegation raised by the motions to quash was held on February 12, 1988. At that hearing, the state and the defense addressed Magee's claims of violations of his right to speedy trial in the light of the four factors set forth in Barker v. Wingo, supra. Magee took the position that as of January 12, 1988, the length of the delay, which began with the filing of the charges, exceeded two years. The prosecutor conceded that the bill of information charging the instant offense and the indictment for aggravated rape had been filed in 1985; however, the prosecutor maintained that Magee had fled this state to Mississippi after the commission of the offenses and that "we got him back as soon as we could." The prosecutor stated that Magee was not incarcerated until December of 1986, when Magee was incarcerated in Mississippi. According to the prosecutor, when Magee was extradited to Louisiana in January of 1987, Louisiana assumed custody of him. Both at the February 12 hearing and in brief, Magee's counsel conceded that Magee had been placed in the custody of Louisiana on January 9, 1987, and that Magee had remained in the state's custody since that date.
At the conclusion of the February 12 hearing, the trial court deferred ruling on the alleged violation of Magee's constitutional right to speedy trial until the following Friday, February 19. As per the pertinent minute entry dated February 19, 1988, the record reflects only that the motions were taken up and argued and that the court denied the motions. Magee disputed the state's position that he had fled the state and was a fugitive from justice. In that regard, the record reflects that, after the February 19 ruling, Magee filed a pleading with the district court requesting a rehearing on the trial court's denial of *1256 the motions to quash to allow him to show that he was not a fugitive from justice and that he had been prejudiced by the delay of trial. The minutes of the court, dated March 25, 1988, reflect that the motion on rehearing was taken up, argued by counsel, and denied by the court.
On February 19, 1988, the trial which had been set for that date, was continued to April 11, 1988. Subsequently, the trial of the instant offense was held April 11-14, 1988, approximately two years and five months from the date the bill of information was filed.
Hence, it appears that the delay in the trial of the instant offense, on its face, is clearly excessive. However, the Barker inquiry does not end with such a finding. Instead, the difficult and sensitive balancing process must be undertaken. See State v. James, 394 So.2d 1197 (La.1981).
Approximately fourteen months of the total delay of two years and five months spanned the period beginning with the filing of the instant bill of information on November 5, 1985, and ending with Louisiana's assumption of custody of Magee in January of 1987.[4] Closely related to the length of the delay is the reason the state assigns to justify the delay. Barker v. Wingo, supra. As previously stated, the state's position was that Magee had fled Louisiana and had remained a fugitive until his arrest in Mississippi in December of 1986. Thus, the state argued that the approximate fourteen month period preceding Louisiana's assumption of custody of Magee was chargeable to defendant. However, the record fails to reveal that the state introduced any competent evidence at the district court level to substantiate its claim that defendant fled and remained a fugitive and that Louisiana had been diligent in securing Magee's return to face charges here. Not only is the state charged with the burden of bringing the accused swiftly to trial, but it is under an obligation to exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution. Rayborn v. Scully, 858 F.2d 84 (2nd Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989). See also Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969).
Absent competent evidence to substantiate the prosecutor's claim, we are unable to determine whether or not Magee was a fugitive fleeing prosecution and whether or not the state fulfilled its obligation in attempting to locate and apprehend him for trial. As a consequence, there is a hiatus in the record relating to two of the Barker factors, the length of the delay and the reason for the delay. In its present posture, we are unable to review Magee's speedy trial claim in a manner comporting with the requisite balancing process of Barker v. Wingo, supra. The incompleteness of the record could probably be eliminated by another hearing on the motions to quash. See, e.g., State v. Kennedy, 438 So.2d 210 (La.1983); State v. Smith, 447 So.2d 565 (La.App. 1st Cir.1984).
We find appropriate the procedure of remand for a reopened hearing on the motions to quash. However, we note that in the instant case Magee was tried only for armed robbery and not for aggravated rape. The motions to quash related to both offenses; this appeal, however, relates only to the motion to quash as concerns the offense of armed robbery. Consequently, the remand of this matter is likewise limited to a redetermination of the speedy trial claim Magee raised as to the offense of armed robbery.
Accordingly, we remand this case for the trial court to receive, at the reopened hearing, competent evidence as to: (1) whether or not Magee was a fugitive fleeing prosecution during the period commencing with the filing of the instant bill of information *1257 or the indictment for aggravated rape and concluding with his arrest; and (2) whether or not the state fulfilled its obligation in attempting to locate and apprehend him. After receiving any such evidence, the court must render a new ruling on the motions to quash by undertaking the balancing process of the four factors set forth in Barker v. Wingo, supra. If the trial court grants the motions to quash the instant bill of information, it must grant the only available relief, i.e., the severe remedy of dismissal of the bill of information. See Barker v. Wingo, supra; State v. Nowell, 363 So.2d 523 (La.1978). Otherwise, we reserve to Magee the right to timely appeal once more any adverse ruling on the motions. In the absence of such a timely appeal, the present conditional affirmance of defendant's conviction and sentence become absolute. Cf. State v. Kennedy, supra.
ASSIGNMENTS OF ERROR NOS. THREE, FIVE, SIX, AND EIGHT:
Defendants grouped these assignments together in a single argument relating to their out-of-court and in-court identifications. By means of assignment number three, defendants contend that the trial court erred by denying their motion to suppress Mrs. Elisa Bagwell's identifications of them at the pre-trial photographic lineup conducted on June 5, 1985.[5] We note that State Exhibit S-1, the photographic lineup, consisted of nine frontal view black-and-white photographs of black men of apparently similar age group and appearance. Defendants argue that that lineup was suggestive. In assignment number five, defendants claim that the trial court erred (during the suppression hearing and at trial) by sustaining the state's objections to any questions concerning the reliability of Mrs. Bagwell's identifications of them, which they assert prevented them from establishing the unreliability of the identifications and the substantial likelihood of misidentification of them. In assignment number six, defendants contend that the trial court erroneously refused to allow the defense to question any of the witnesses about the separate, live lineup conducted on or about May 29, 1985, in Thibodaux[6] and that, as a result thereof, they were denied full cross-examination and were prevented from introducing prior inconsistent statements made by the witnesses. Finally, by means of assignment number eight, defendants argue that their rights to due process were violated when the trial court refused to allow the jury to see prior allegedly inconsistent statements given to the police by the state's witnesses, which denied the jury the opportunity to see exculpatory Brady material.

SUGGESTIVENESS OF IDENTIFICATIONS
A defendant attempting to suppress an identification must prove (1) that the identification was suggestive and (2) that there was a likelihood of misidentification in the identification procedure. State v. Lucky, 453 So.2d 1234 (La.App. 1st Cir. 1984), writ not considered, 459 So.2d 529 (La.1984). If a witness's attention is focused on the defendant during the lineup, the identification procedure is unduly suggestive. State v. Robinson, 386 So.2d 1374 (La.1980). In reviewing the procedure, the trial court must look at the totality of the circumstances surrounding the identification. State v. Brown, 481 So.2d 679 (La. App. 1st Cir.1985), writ denied, 486 So.2d 747 (La.1986).
*1258 Houma City Police Detective Patrick Babin testified that he prepared the photo lineup which resulted in Mrs. Bagwell's identifications. Babin stated that he utilized a photo lineup rather than a live lineup of defendants because, at that time, defendants could not be located. They had not yet been arrested, and their whereabouts were unknown to the police.[7] In preparing the lineup, Babin obtained photographs of Joseph Collins and Robert Magee from the New Orleans City Police Department. According to Babin, he believed the photograph of Magee had been taken in 1973 and that of Collins in 1983. Using a camera, he reproduced those photographs and obtained photographs of seven other men of similar age, having similar facial features, from the Houma City Police mug books to assemble the nine-picture lineup. Babin testified that he took the photo lineup to the Main Street Branch of Fleet Finance on June 5 and exhibited the lineup to Mrs. Bagwell, Ms. Lila Duplantis, and Ms. Ledet.[8] Babin stated that each viewer was allowed to view the lineup separately, out of the presence of the other two. In presenting the lineup to each of the three viewers, Babin explained that the lineup included the pictures of two persons believed to have been perpetrators of the instant offense. Only Mrs. Bagwell made an identification. She selected the photographs of Collins and Magee from the lineup as depicting two of the participants.
Mrs. Bagwell testified that, on June 5, Babin exhibited the photo lineup to her and asked her if she recognized any one of the persons depicted in the photographs. Contrary to Babin's testimony, Mrs. Bagwell stated that Babin did not tell her that the lineup included a picture of anyone suspected of committing the instant offense. However, Mrs. Bagwell testified that, from the lineup, she selected the pictures of both defendants.
Defendants argue that Babin's statement to Mrs. Bagwell that the lineup included the photographs of two suspects placed the burden on her to select two individuals and was thus suggestive. Defendants contend that Mrs. Bagwell's testimony contradicting Babin's testimony that he made such a statement suggests that Mrs. Bagwell was attempting to hide the fact that some suggestion had been made to her.
We disagree. The circumstances of a victim being informed that a suspect is included in a lineup, in itself, does not constitute suggestiveness for it is generally assumed if one is called to examine a photographic or physical lineup that there is a suspect in the group. See State v. Stewart, 389 So.2d 1321 (La.1980); State v. Gibson, 511 So.2d 799 (La.App. 4th Cir. 1987), writ denied, 514 So.2d 1174 (La. 1987). Notwithstanding that there was conflicting testimony as to whether or not Babin told Mrs. Bagwell that the lineup included two suspects, even assuming Babin made such a statement, the statement does not constitute suggestiveness. See State v. Stewart, supra; State v. Gibson, supra. The alleged statement indicating the lineup included multiple (two) suspects rather than a single suspect does not alter our conclusion that such a statement does not constitute suggestiveness. Evidence introduced at trial showed that the instant offense involved four or possibly five perpetrators. At the time of the lineup, Babin did not tell Mrs. Bagwell that either of the two suspects in the lineup were Collins or Magee. Telling her that there were two suspects in the lineup placed no greater burden on Mrs. Bagwell to select two individuals from the lineup than would telling any victim of a crime viewing a *1259 lineup that a (one) suspected perpetrator of the crime is in the lineup burdens the victim to select one person from the lineup.
Additionally, Magee argues that the 1973 photograph of him, taken at least twelve years before the lineup, does not qualify as a contemporaneous depiction of him in 1985 and concludes that the picture should not have been used in the lineup. Although Magee's observation that his picture did not qualify as a contemporaneous depiction of him is apparently accurate, in our view, the use of such a picture would if anything have been favorable to Magee and detrimental to the state. More particularly, we fail to see how the use of Magee's approximate twelve-year-old photograph was suggestive, since all the photographs comprising the photo lineup appear to be of individuals of the same approximate age. See State v. Larose, 510 So.2d 732 (La.App. 4th Cir.1987), writ denied, 516 So.2d 129 (La.1987).
After viewing the photo lineup itself and carefully considering all pertinent testimony given at the suppression hearing and at trial, we conclude that the identification procedure herein was not unduly suggestive. Furthermore, even assuming arguendo that the identifications were suggestive, such an assumption would not result in the reversal of defendants' convictions, since (as set forth more fully hereinafter) the totality of the circumstances present in this case demonstrate that the identifications were reliable. See State v. Brown, supra.

QUESTIONING AS TO RELIABILITY
In State v. Nicholas, 397 So.2d 1308 (La.1981), the trial court limited inquiry at the suppression hearing to suggestiveness. However, in spite of that limitation, the Nicholas court found evidence in the record of the hearing and the trial itself upon which to apply the reliability standards articulated in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and conclude that it did not appear that any substantial likelihood of misidentification existed.
During the suppression hearing in the instant case, the defense was allowed to elicit a considerable amount of testimony relative to the Manson reliability standards. However, upon the objections of the prosecutor, the trial court ruled that the issue of reliability was a matter for the jury to decide, that the defense would be permitted to present evidence pertaining to the issue to the jury, and that the issue was not relevant to the trial court's determination of whether or not to suppress the pre-trial identifications. Clearly, reliability is the linchpin in determining the admissibility of identification testimony. See State v. Lowenfield, 495 So.2d 1245 (La. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). Thus, we conclude that the trial court erred in its ruling set forth above. However, notwithstanding that the defense's inquiry into reliability was to some extent limited at the suppression hearing, we conclude that the erroneous ruling was harmless. Crucial to that determination, and contrary to defendants' assertions, we note that at trial the defense was in fact allowed extensive and full cross-examination of the witnesses as to reliability. More particularly, as more fully detailed hereinafter, we find that the Manson standards of reliability were met in this case. Cf. State v. Nicholas, supra.

QUESTIONING AS TO LIVE LINEUP
The record reveals that, at the suppression hearing, defense counsel sought to question Detective Babin in regard to the live lineup held in Thibodaux. The state objected on relevancy grounds, and the trial court sustained the objection. Thereafter, during the trial testimony of Lila Duplantis, Duplantis testified that, at the live lineup, she picked out one of the robbers, who was neither Magee nor Collins. When the defense sought to interrogate Duplantis concerning the live lineup, the state reurged its objection, and the trial court sustained the objection. Later, during Detective Babin's trial testimony, the defense attempted to cross-examine Babin as to the live lineup to which the state objected. The jury was removed from the courtroom and, out of the presence of the *1260 jury, the court ruled that the defense would be given the choice of whether or not to question the witness concerning the live lineup but that, upon such questioning by the defense, the court would consider the defense to have opened the evidentiary door to the state to elicit any testimony relating to the live lineup that might be favorable to the state.
During the course of trial, the trial court is accorded broad discretion to end irrelevant and immaterial questions. State v. Passman, 345 So.2d 874 (La.1977). This same measure of discretion exists in ruling on relevancy made during the course of a hearing on a motion to suppress. State v. Passman, supra. Herein, we find no abuse of discretion by the trial court as set forth above. After a thorough review of the evidence introduced at the suppression hearing and at trial, we conclude that the trial court's rulings neither denied defendants full cross-examination nor prevented defendants from introducing prior allegedly inconsistent statements made by the witnesses. Moreover, the defense, through often repetitive questioning, thoroughly cross-examined Mrs. Bagwell as to Stevenson and Robinson, whom she selected from the live lineup, including their roles in the crime and her descriptions of them.

ALLEGEDLY PRIOR INCONSISTENT STATEMENTS TO POLICE
Defendants claim that their rights to due process were violated by the trial court's refusal to allow the jury "to examine" or "to see" alleged Brady material, i.e., allegedly prior inconsistent statements that state witnesses allegedly gave to the police. This claim is also devoid of merit.
The record reflects that the statements to which defendants refer are statements that were made by the victims to Detective Babin on May 7, 1985, during the initial police investigation of the instant offense. The record further reflects that defense counsel had access to all the statements through pre-trial discovery, that during discovery he had tape-recorded the statements and had them transcribed and that he used those transcripts to cross-examine the victims who testified at trial as to the statement each of them gave to Detective Babin. Additionally, although Ms. Jane Doe did not testify in this case, the defense was permitted to introduce her statement to Babin into evidence. When the defense sought to introduce the other statements into evidence, the state objected. The trial court determined that the statements were inadmissible. In its ruling, the court noted that, when questioned about their statements, none of the witnesses denied making the statements and that the statements had not been used to refresh the witnesses' memories. We find no error in the ruling.

RELIABILITY OF IDENTIFICATIONS
The factors to be used in determining reliability include: (1) the opportunity of the witnesses to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the description, (4) the witness's level of certainty, and (5) the time between the crime and the confrontation. Manson v. Brathwaite, supra; State v. Lucky, supra. Applying the Manson reliability standards to the instant case, we find that Mrs. Bagwell's pre-trial identifications of defendants were reliable and her in-court identifications had an independent basis.
Mrs. Bagwell testified that, at about 11:30 a.m., on the day of the robbery, while taking Ms. Jane Doe's place as cashier, she observed three black males come into Fleet Finance. The three, Collins, Magee, and Stevenson, asked street directions. About five and one-half hours later, at the time of the instant offense, she observed four perpetrators enter Fleet Finance. Mrs. Bagwell stated that Collins was the tallest perpetrator and the first man inside. She further described him as having a smooth complexion and a long face. The second man to enter was Stevenson, who put a gun in her face. Magee, who was shorter, was the third man to enter the office. Mrs. Bagwell stated that Robinson was the man with "bumps" on his face. She stated that she looked at defendants' faces and eyes and not at their clothing. Defendants were *1261 the first two perpetrators with whom she made eye contact. Mrs. Bagwell testified that, at the time she gave her May 7 statement to Detective Babin, she told him she could identify only two individuals. However, she explained that she could not, at that time, identify (any others) in a picture or a drawing, but that she later identified two other perpetrators at the live lineup. Mrs. Bagwell stated that defendants were "all over the place" and that she could have had several eye contacts with them. She testified that she had been trained to make eye contact and that is how she recognized defendants by their eyes and not by their clothing or hair style. According to Mrs. Bagwell, when the perpetrators first entered Fleet Finance, she had a clear view of those who entered. When made to lie on the floor, she could not lie flat, and, as a result, she could still see what was happening. Mrs. Bagwell stated that the robbery lasted longer than a "minute or two" and long enough for her to get a "good look" at the robbers. The pre-trial identifications were made on June 5, approximately one month following the robbery. Approximately three years elapsed between the robbery and the in-court identifications. Both the in-court identifications and out-of-court identifications were positive and unequivocal. In view of all the above facts, the out-of-court identifications were clearly reliable, and the in-court identifications had independent bases.
These assignments lack merit.
ASSIGNMENT OF ERROR NO. FOUR:
By means of this assignment, defendants contend that the trial court erred by refusing to allow state witness Ray Fletcher to examine his prior statement in order to refresh his memory.
In accordance with LSA-R.S. 15:279,[9] a witness may be allowed to refresh his memory by examining memoranda. It is immaterial by whom or when the memoranda were made, provided that after such inspection, the witness can testify to the fact from his present memory. State v. Hookfin, 476 So.2d 481 (La.App. 1st Cir. 1985).
On direct examination, Fletcher testified how one of the perpetrators had placed a gun to his forehead, grabbed him by his tie, yanked him from his chair, brought him to the front of the office, and demanded to know where the money was located. Thereafter, on cross-examination, defense counsel began by informing Fletcher that he was going to question him in regard to statements Fletcher had made to the police immediately after the crime and, particularly, in regard to a description of one of the perpetrators which Fletcher had given to the police. In that regard, the following exchange took place:
Q. Now, you gave a statement to Detective Babin after this occurred, did you not?
A. Yes.
Q. What did you tell Detective Babin about the description of any of the individuals in the place?
A. If I'm not mistaken, the only thing I could remember is the one that had me originally was wearing a tam, a French tam, or a cap or whatever it was.
Q. Okay. If I were to help you and read to you what you told Detective Babin, would that help you?
A. I hope soit's been a long time.
Q. That would refresh your memory?
A. Yes.
Q. You basically stated that you saw a Black male `who grabbed me by the front of my shirt and put a gun in my face.'
A. Uh-huh. (Indicating yes).
Q. `The gun appeared to be a blue steel revolver, possibly a .38 caliber. The male with the gun to me was in his mid-20's, medium build, approximately 5' 10" to 6' tall, with short-cropped hair.' Does that help your memory?
*1262 A. I don't recall ever giving a complete description of the revolver, no.
Q. If I showed you the statement, would that help you?
A. Yes, if that's what I said at the timeI'm sure that's what I would remember at that time.
At that juncture, the state objected. The jury was removed from the courtroom. Out of the jury's presence, the court sustained the state's objection by ruling that the witness had the right to refresh his memory, but that since he had not sought to exercise that right, defense counsel could not demand that the witness refresh his memory.
Based upon the record, we are unable to conclude that the witness ever actually expressed his desire to refresh his memory from the statement. In that posture, we find no error in the trial court's ruling. Even assuming arguendo that the witness expressed such a desire and that the trial court's ruling was thus erroneous, the record reflects that, after the jury was returned to the courtroom, defense counsel resumed his cross-examination of Fletcher by reading the description Fletcher had given to Detective Babin. The court's minute clerk contemporaneously wrote the description on a blackboard in court, apparently for the viewing of those present, including the witness and the jury. During further cross-examination, Fletcher acknowledged that the statement was the one he had given to Babin, and, to his knowledge, the statement was what he had said at the time he made the statement. Accordingly, under these circumstances, any error was harmless.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NOS. SEVEN AND NINE:
In assignment number seven, defendants assert that the trial court erred by commenting upon the facts of the case in the presence of the jury. In assignment number nine, defendants claim that the trial court erred by allowing the prosecutor in his closing argument to state that neither defendant worked for a living.
These assignments relate to comments made by the trial court and the prosecutor during the following exchange, which occurred during the state's closing argument in rebuttal:
MR. DAIGLE:
* * * * * *
I'm not going to go into all the other things, but I'm going to tell you one thing: This was a terrible offense. Everybody on this jury, you all work for a living, your husband or your wives work for a living. You don't go out and steal. I work for a living. Those two guys don't. They steal. They prey on people like you and me.
MR. DORNAN: I'm going to object, Your Honor. Your Honor, Mr. Daigle can comment on the evidence, but he can't go off and make allegations concerning either Mr. Magee or Mr. Collins. There is no evidence that was ever introducedhe's going well beyond the scope of what he's allowed to do
THE COURT: I think he's referring to the fact that they've been accused in this particular crime.
MR. DORNAN: Your Honor, he referred to them as not working.
THE COURT: Well, there is no evidence that they are.
MR. DORNAN: Excuse me ...?
THE COURT: I haven't seen any evidence presented at this trial that they are working.
MR. DORNAN: Well you can't bring something uphe's supposed to be arguing about the evidence.
THE COURT: He can comment on the evidence or the lack of evidence.
MR. DORNAN: That's correct, and there was never any evidence of that. Note my objection.
THE COURT: And there was never any evidence that they were working. The objection is overruled. Proceed.
Citing LSA-C.Cr.P. art. 774, defendants argue that the prosecutor's statement that they do not work for a living was outside the proper scope of closing argument, since *1263 no evidence had been introduced concerning their employment status. They further argue that the trial court's comments as to the absence of evidence of their employment were prohibited by LSA-C.Cr.P. art. 772. Defendants contend that reversible error was committed.
LSA-C.Cr.P. art. 774 restricts closing argument to the evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. A prosecutor should refrain from argument which tends to divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law. State v. Messer, 408 So.2d 1354 (La. 1982).
Herein, the prosecutor's comment that defendants did not work was made in a context in which the prosecutor clearly characterized defendants as thieves, a characterization supported by the evidence. In our view, the comment was intended as no more than part of that characterization. Hence, we do not find that the comment exceeded the limits of proper argument set forth in LSA-C.Cr.P. art. 774.
Defendants also argue that the trial court's comments that there was no evidence they were working were prohibited by LSA-C.Cr.P. art. 772. LSA-C.Cr.P. art. 772 provides as follows:
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.
In that regard we note that, because defendants neither entered an objection to the trial court's comments nor articulated such a ground for objection to the trial court, defendants' argument constitutes a new and additional ground for objection. A defendant is limited on appeal to grounds for objection articulated at trial. Hence, the argument cannot be raised for the first time on appeal. State v. Waymire, 504 So.2d 953 (La.App. 1st Cir.1987). In any event, even assuming the trial court's comments were in violation of LSA-C.Cr.P. art. 772, since the comments did not imply an opinion as to defendant's guilt or innocence, any error was harmless. See State v. Joseph, 437 So.2d 280 (La.1983). Moreover, defendants do not allege prejudice, and we find no prejudice.
Accordingly, these assignments lack merit.
ASSIGNMENT OF ERROR NO. TEN:
By means of this assignment, Collins claims that the trial court erred by failing to quash the bill of information charging him as a multiple felony offender and by sentencing him as a multiple felony offender. In support of his claim, Collins argues only that the state failed to prove that his guilty pleas to the predicate offenses were entered voluntarily and with a knowing waiver of his constitutional rights in accordance with Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).[10]
The bill of information charging Collins as a multiple felony offender sets forth three predicate convictions, excluding the instant conviction, to wit:
(1) On October 20, 1978, guilty plea to possession of Phenmetrazine in case number 266-418 in Orleans Parish Criminal District Court;
(2) A December 22, 1981, guilty plea to theft in case number 285-511 in Orleans Parish Criminal District Court; and
(3) A December 22, 1981, guilty plea to simple burglary in case number 285-650 in Orleans Parish Criminal District Court.
*1264 In order for a guilty plea to be constitutionally valid, there must be a contemporaneous record that demonstrates that the plea was made voluntarily and with a knowing waiver of the right to trial by jury, the right to confront accusers, and the privilege against self-incrimination. Boykin v. Alabama, supra; State v. Halsell, 403 So.2d 688 (La.1981). Only when there is such a contemporaneous record establishing a valid guilty plea can the prior conviction be used to enhance a sentence under LSA-R.S. 15:529.1. State v. Ourso, 502 So.2d 246 (La.App. 3rd Cir.1987), writ denied, 505 So.2d 1138 (La.1987). While a colloquy between the judge and defendant is the preferred method of proof of a free and voluntary waiver, the colloquy is not indispensable when the record contains some other affirmative showing of proper waiver. State v. Nuccio, 454 So.2d 93 (La. 1984).
In this case, Collins was adjudged and sentenced by the trial court as a second felony habitual offender.[11] Hence, the state was required to prove only that one of Collins' (predicate) convictions listed in the bill of information had been entered into voluntarily and with a knowing waiver of his Boykin rights.
In that regard, the state introduced evidence at Collins' multiple offender hearing pertaining to each of the three predicate convictions listed in the multiple offender bill of information. In reference to the guilty plea to possession of Phenmetrazine, the state introduced a certified copy of each of the following: the pertinent minute entry of the Orleans Parish Criminal District Court dated October 20, 1978; the transcript of the guilty plea; and a "plea of guilty" form executed that same day. In reference to the guilty plea to theft, the state introduced a certified copy of the pertinent minute entry of the Orleans Parish Criminal District Court dated December 22, 1981. In reference to the guilty plea to simple burglary, the state introduced a certified copy of the pertinent minute entry of the Orleans Parish Criminal District Court dated December 22, 1981, and a certified copy of "waiver of constitutional rights plea of guilty" form bearing that same date.
As to each of the three predicate convictions, the documents introduced at the multiple offender hearing did not indicate that Collins was advised of and knowingly waived his privilege against self-incrimination, his right to a jury trial, and his right to confront his accusers at the time he entered the respective guilty pleas. See State v. Age, 417 So.2d 1183 (on rehearing) (La.1982); State v. Williams, 384 So.2d 779 (La.1980). Absent proof that Collins was properly Boykinized, these guilty pleas cannot be used to enhance Collins' sentence under the habitual offender statute. State v. Lefevre, 419 So.2d 862 (La.1982); State v. Abrams, 527 So.2d 1057 (La.App. 1st Cir.1988). Accordingly, Collins' habitual offender adjudication and sentence are vacated; and the case is remanded to the district court for further proceedings consistent herewith.
ASSIGNMENTS OF ERROR NOS. ELEVEN, TWELVE, AND THIRTEEN:
By means of these assignments, defendants contend that the evidence was insufficient to support their convictions. However, they generally assert that the evidence was insufficient without setting forth any specific argument to support their contention.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana must determine if the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime were proved beyond a reasonable doubt. LSA-C.Cr.P. art. 821; State v. Captville, 448 So.2d 676 (La.1984). Additionally, where the key issue is an accused's identity as the perpetrator, rather than whether or not the *1265 crimes were committed, the state is required to negate any reasonable probability of misidentification. State v. Richardson, 459 So.2d 31 (La.App. 1st Cir.1984).
The testimony of the victim is sufficient to establish the elements of the offense. State v. Bennett, 506 So.2d 835 (La.App. 1st Cir.1987). In the instant case, Mrs. Bagwell positively and unequivocally identified Collins and Magee as two of the perpetrators of the instant offense. Despite extensive and repeated cross-examination, she never wavered during her testimony in regard to the identity of defendants.
We conclude that the state carried its burden of proof by negating any reasonable probability of misidentification of defendants as perpetrators. The evidence of record is clearly sufficient to support the jury's verdicts.
Accordingly, these assignments are without merit.

CONCLUSION
For the above reasons, Collins' conviction is affirmed, the habitual offender adjudication and sentence are vacated, and the case is remanded for further proceedings consistent with the views expressed herein. As concerns Magee, the case is remanded for a reopened hearing on Magee's Motions to Quash. His conviction and sentence are conditionally affirmed. See State v. Kennedy, supra.
COLLINS' CONVICTION AFFIRMED, HABITUAL OFFENDER ADJUDICATION AND SENTENCE VACATED, CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH VIEWS EXPRESSED HEREIN.
MAGEE'S CONVICTION AND SENTENCE ARE CONDITIONALLY AFFIRMED, CASE REMANDED FOR A REOPENED HEARING.
NOTES
[1] The sentencing transcript does not show whether the 198 years is without benefit of probation, parole, or suspension of sentence. However, the minute entry states that the 198 years is without benefit of probation, parole, or suspension of sentence. Such a sentence should be without probation, parole, or suspension of sentence. State v. Bruins, 407 So.2d 685 (La. 1981). Where there is a discrepancy between the transcript and a minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732 (La. 1983). Failure to deny probation, parole, or suspension of sentence is favorable to Collins, and, in accordance with State v. Jackson, 452 So.2d 682 (La.1984) and State v. Fraser, 484 So.2d 122 (La.1986), this Court cannot correct the error since the error is favorable to Collins and the prosecutor has not complained that the sentence is illegally lenient.
[2] The name "Jane Doe" is used in this opinion in order to protect the identity of the female employee who was raped during the commission of the instant offense. We further note that she did not testify in this case.
[3] The minutes do not reflect that Magee or his counsel objected to the April 13 or the September 14, 1987, continuance.
[4] The record reveals that the indictment charging aggravated rape bore the docket number 156105. However, the record neither reflects the date the indictment was filed nor does it contain a copy of the indictment. Depending upon whether or not the indictment for the aggravated rape (which occurred during the commission of the instant offense) was filed before the bill of information for the instant offense, the actual periods of delay may have exceeded those set forth in this opinion.
[5] In determining whether or not the ruling on defendants' motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222 (La.1979); State v. Fleming, 457 So.2d 1232 (La.App. 1st Cir. 1984), writ denied, 462 So.2d 191 (La.1984).
[6] In assignment of error number six, defendants refer to a "separate photographic lineup" and indicate that that lineup was held in Thibodaux, Louisiana, on May 29, 1985. The record, however, fails to reflect that a photographic lineup was held in Thibodaux on that or any other date. However, since the record reveals that a live lineup was held in Thibodaux on May 29, 1985, we assume that that lineup is in fact the one to which defendants' assignment six relates; and, accordingly, we address defendants' argument in that light.
[7] The record reveals that, at the suppression hearing but not at trial, Detective Babin testified that the photo lineup was conducted as a result of John Stevenson's admission that he participated in the instant offense and information obtained from Stevenson that defendants were co-perpetrators of the crime.
[8] The record reveals that Ms. Ledet, an employee of the Main Street Branch of Fleet Finance, worked there on the day of the instant offense. Although she was not present at the time the offense occurred, she viewed the lineup to determine whether or not she could identify any of the individuals in the lineup as having been inside Fleet Finance at any time earlier that day while she was at work.
[9] Although LSA-R.S. 15:279 is the law applicable to defendants' trial, those provisions were repealed by Acts 1988, No. 515, § 8 which enacted the Louisiana Code of Evidence. Subject to the provisions of Section 12 of the Act, the Act became effective January 1, 1989. See C.E. arts. 612 and 803(5) which replace those provisions.
[10] Magee and Collins additionally argued in brief that their sentences are excessive. Because this argument exceeds the scope of assignment number ten and is not included in any other formal assignment of error, the argument is not properly before this Court. In accord with the well-established jurisprudence of the Louisiana Supreme Court under the provisions of LSA-C.Cr.P. arts. 844 and 920, this Court will not consider such an argument which is neither assigned as error nor related to error patent on the face of the record. See State v. Spears, 350 So.2d 603 (La.1977); State v. Overton, 337 So.2d 1201 (La.1976).
[11] The trial court concluded that it was satisfied that the state had proved Collins was the same Joseph Collins who committed the three predicate convictions set forth in the multiple offender bill. However, the court stated that out of precaution it would adjudicate Collins only as a second felony habitual offender.