647 So.2d 1355 (1994)
STATE of Louisiana
v.
Lynn L. COLEMAN.
No. 94-KA-0666.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1994.
*1356 Richard Leyoub, Atty. Gen., Baton Rouge, and Darryl W. Bubrig, Sr., Dist. Atty., Parish of Plaquemines, Pointe-A-La-Hache, and Gilbert V. Andry, III, Asst. Dist. Atty., New Orleans, for appellee.
Timon Webre, Plaquemines Parish Indigent Defender Bd., Point-A-La-Hache, for appellant.
Before SCHOTT, C.J., and CIACCIO and LANDRIEU, JJ.
LANDRIEU, Judge.
Lynn L. Coleman was indicted by a grand jury for the second degree murder of Benjamin Franklin in violation of La.Rev.Stat.Ann. § 14:30.1 (West Supp.1994). After a trial on the merits, a twelve-member jury found her guilty of the responsive verdict of manslaughter. She was sentenced to serve fifteen (15) years at hard labor. On appeal, the defendant raises four assignments of error for the reversal of her conviction and sentence. We affirm.

FACTS
At approximately 12:03 p.m. on February 6, 1993, Officer Shelby Lavergne, Jr., Plaquemines *1357 Parish Sheriff's Office, responded to a call on Good Rocking Lane, Sunrise, Louisiana where a male subject had sustained a gunshot wound to the chest. When Officer Lavergne arrived on the scene, he observed the victim, Benjamin Franklin, lying twenty feet from the front door of a house trailer. Witnesses advised him that the defendant was inside the trailer with the gun but he and other officers, who had arrived, found no one inside the trailer.
Officer Anthony Smith after arriving on the scene at approximately 12:14 p.m. determined from witnesses that the defendant lived in the trailer and found a hand gun in the weeds behind it.
When Deputy Bruce Buras arrived on the scene, he was instructed to search for a black woman wearing a blue overcoat and carrying a young child. He apprehended the defendant in a trailer about two to three blocks from the scene of the crime. After Deputy Buras advised the defendant of her rights, she informed him that she had thrown the gun in some weeds behind her trailer.
Detective Curtis Bowers testified that after the defendant was returned to the scene and read her rights, she stated that she and the victim had an argument the night before and that she had put him out of the trailer. The next morning the victim returned to retrieve some of his belongings. As the defendant attempted to hand Franklin a box containing cologne through a window, the revolver that she held in her hand accidently discharged. Detective Bowers could not find a box containing cologne on the scene, and although some boxes were found outside the trailer, they were weathered and all were too big to have fit through the window. Further, Detective Bowers could find no weapon, including a stick, near the victim.
After Detective Bowers transported the defendant to the Port Sulphur jail, she gave a second statement. In that taped statement, Ms. Coleman said that after she asked the victim to leave the trailer the night before, he returned during the night, beat on her trailer with a stick, and kept her up all night. The tape was played to the jury and it revealed that the defendant said there was a white and black box outside the trailer containing a wrench. Detective Bowers found no such box. The defendant also stated that she had left, at some point during the night, to get help. Upon checking the record of the Plaquemines Parish Sheriff's Office, Detective Bowers found that a 911 call had been placed by the defendant's neighbor. Detective Bowers further noted that the defendant did not have any bruises, scrapes, or wounds on her body that day.
On cross examination, Detective Bowers testified that the defendant stated that the victim had both slapped and pushed her. She further informed him that the victim kept a shotgun in his truck; however, there was no truck on the scene and she told him that the victim had never threatened her with the gun. Detective Bowers was able to substantiate that at some point during that day the victim had a stick in his hand. Lastly, he testified that the defendant never stated she intentionally shot to kill Franklin or that she acted in self-defense.
Louise Walzer, supervisor and director of the Jefferson Parish Criminal Laboratory, testified that the spent casings found at the scene were fired from the weapon recovered at the scene. She stated that the gun was a Smith & Wesson, and that such a gun does not discharge unless the trigger is pulled. If the gun is not cocked, it cannot accidentally fire. On cross examination, Ms. Walzer stated that poorly maintained and poorly constructed weapons can accidentally discharge.
Dr. Fraser McKenzie, pathologist, performed an autopsy on the victim. He testified that the projectory of the bullet proceeded downward in a straight line fashion. The bullet entered the mid-chest and exited out of the right back. Dr. McKenzie further stated it was possible that the victim could have staggered twenty feet before falling.
Louvina Ford, one of the defendant's neighbors, testified that she saw the victim knocking on the defendant's door. After Ms. Ford heard the gunshot, she saw the victim *1358 fall. She further testified that she saw the curtain to the trailer window move, but she did not see anyone exit the trailer. Ms. Ford did not see any boxes being passed through the window.
Ann Baker, a neighbor who also lives in the trailer park, was at Ford's trailer when she heard the victim knocking on the defendant's trailer. She testified that the victim held nothing in his hand. Upon hearing the fatal shot, she too saw the victim fall. As Franklin tried to get up, he stumbled and fell in a pool of water. Ms. Baker instructed Ford to call 911 while she ran around the corner to get her brother-in-law, Harold Merrick. She stated that the victim was not holding a box and she did not see anyone exit the trailer.
Kewanda Jackson, 13, testified that while walking to Ford's trailer she observed the victim knocking on the defendant's trailer with a stick. She went back to her mother's house, but later returned to Ford's. On the way, she saw the victim still knocking on the trailer with a stick. As she entered Ford's trailer, she could still hear the knocking. Kewanda later observed the victim walk away from the trailer, and then return without the stick and continue to knock. He yelled for the defendant to open the door. After Kewanda heard the shot, she saw the victim drop. He then got up and started to walk away only to fall again. Thereafter, she saw a hand close the shade in the window. Lastly, Kewanda testified that she heard the victim say, "She shot me." She observed no boxes in the area.
Harold Merrick testified that the victim had been staying with the defendant, but she had "put him out" the night before the crime, and he stayed with him. The next morning the victim went to the post office to see if his unemployment check had arrived. It had not, and he returned. He then went to the bank and to a store. He returned and gave Merrick $5.00. The victim told Merrick he had $10.00 left and that he was going to go "party." He went to the defendant's trailer to retrieve a pair of tennis shoes. He returned without the shoes. He left again to get the shoes. Merrick then heard his sister-in-law scream. He went outside to find the victim dying. On cross examination, Mr. Merrick stated that the victim told him that the defendant had shot at him the night before, and that he planned not to go back to the trailer because the defendant was "crazy." He said that the defendant owned a shotgun, but that she had given it to the victim in exchange for a pistol. Mr. Merrick knew no reason why the defendant would want to kill the victim, and that the victim was "hurt" by the defendant rather than angry at her.
Terry Riley testified that he stayed at the defendant's trailer the night before the crime. He left the trailer at 6:30 a.m. the next morning. According to his testimony, he never heard any banging or hitting on the trailer during the night. Although the defendant informed him that she and the victim had an argument and that she had fired a gun at the floor to scare him, the defendant did not say anything about wanting to kill the victim.
Chanell Black testified that the police arrived at her house and asked if she had seen the defendant. She had been asleep and said that she had not. At some later point, the defendant walked out of her bathroom and she realized that the defendant had been there. The defendant told Ms. Black that she had been passing a box out of the window when the gun went off. Ms. Black admitted that the defendant changed her story several times, and that at one point she said that she aimed the gun out of the window to scare the victim.
The defense called Mona Jackson who testified that she was at her mother's trailer when the defendant came over and told her that the victim had made the baby nervous and that the gun accidentally discharged. According to Ms. Jackson's testimony, the defendant stated that the victim had been wrestling with her when the gun fired.

DISCUSSION

ERRORS PATENT
Our review of the record reveals no errors patent. Although the record does not contain *1359 a minute entry of sentencing, the sentencing transcript reveals the defendant was present during sentencing.

ASSIGNMENT OF ERROR ONE
The defendant contends that the trial court improperly overruled a challenge for cause of prospective juror Steven M. Meyers. Specifically, the defense argues that Mr. Meyers was biased against the defendant because the defendant did not intend to testify.
During voir dire, the defense asked if the State failed to prove its case, would the prospective jurors find the defendant guilty based on her failure to testify. Meyers responded, "I want to hear her talk and I want to hear what has happened." The court then re-phrased the question. Still the juror responded, "I still would want to hear her." The court pressed as to what the juror would do if not given that opportunity. The juror responded that he did not know. The court then asked him if, when he went into the jury room, he would say, "[t]hey didn't prove their case, but I want to hear what she has to say." The juror then responded "No." The court asked, "What would you do?" He said, "[m]e personally, I would like to hear her. I understand all of that, but I would want to hear her." Again, the court asked what he would do if he were not given that opportunity. The juror then said, "Well, I guesswell, I see now. I see what you are saying." The defendant challenged the juror for cause. The trial court denied the challenge finding that the juror had been rehabilitated. The defense then filed a peremptory challenge, and the trial court later dismissed the juror. The defense exhausted all twelve peremptory challenges. See La.Code Crim.Proc.Ann. art. 799 (West Supp.1994). She is thus entitled to complain on appeal of the ruling refusing to maintain her challenge for cause. La. Code Crim.Proc.Ann. art. 800 (West Supp. 1994); State v. Scriber, 605 So.2d 661 (La. App. 2d Cir.1992); State v. Isgitt, 590 So.2d 763 (La.App. 3d Cir.1991).
An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination. La. Const. Art. I, § 17 (West 1977). The purpose of the voir dire is to determine the qualifications of prospective jurors by "testing their competency and impartiality and discovering bases for [the] intelligent exercise of cause and peremptory challenges." State v. Burton, 464 So.2d 421, 425 (La.App. 1st Cir.), writ denied, 468 So.2d 570 (La.1985). The trial court is vested with broad discretion in ruling on a challenge for cause, which ruling will not be disturbed absent a showing of abuse of that discretion. State v. Comeaux, 514 So.2d 84 (La.1987).
A juror who is incapable of recognizing the defendant's presumption of innocence is not competent to serve. State v. Davenport, 445 So.2d 1190 (La.1984). However, where a juror had voiced an opinion seemingly prejudicial to the defense but subsequently, upon further inquiry or instruction by the court, demonstrates willingness and ability to decide the case impartially, according to the law and evidence, the juror is qualified to serve. State v. Bates, 397 So.2d 1331, 1334 (La.1981).
In State v. Lindsey, 543 So.2d 886 (La. 1989), cert. den., Lindsey v. Louisiana, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990), a prospective juror originally stated that "it would not bother" him if he did not hear from both sides before reaching a verdict. Defense counsel apparently confused the prospective juror's responses with another prospective juror's response and challenged the juror. Upon further questioning the juror attempted to tell the court that he "would have no problem" if the defendant did not testify and again reiterated that he would not hold the defendant's failure to testify against him. The prospective juror did say that he "assumed" that he would hear from both sides, but he further stated he would accept the judge's instructions regarding the defendant's case. The Louisiana Supreme Court held that "[a]ny confusion in [the juror's] responses resulted from the challenge of the wrong person. In any event, [the prospective juror] was more than adequately rehabilitated." Id. at 897.
*1360 In State v. Sims, 529 So.2d 454 (La.App. 1st Cir.), writ denied, 532 So.2d 764 (La. 1988), during questioning by the court, a prospective juror testified that he would be affected by defendant's failure to take the stand. He indicated that his feelings were based in part upon his opinion that, if accused of a crime, he would want to explain his side. Upon further questioning, the juror related that he could put that opinion out of his mind and give the state and the defendant a fair trial. The trial court specifically inquired whether or not he was so set in his opinion that he could not give an accused a fair trial. He testified that he was sure he could. The court later asked whether or not he could follow the law instructed by the court and if he would want a juror with the same opinion to sit in judgment if he were on trial. He again testified that he could follow the directions of the court. Defense counsel also questioned him, asking him whether or not he would presume defendant was guilty if he failed to take the stand. He responded that he understood the court's explanation and that he would not find defendant guilty because he did not want to testify. The defendant challenged him on the grounds that he would be unable to recognize the presumption of innocence. Satisfied that his responses indicated that he could be fair and impartial, the trial court denied the challenge.
A second challenged juror initially indicated that she believed the defendant must be guilty simply because he was on trial for the offense. However, when defense counsel asked her if she actually felt defendant must be guilty, she responded, "Well, I feel we don't know the whole story of what he did wrong or why he's actually here." She then advised the court she could put her opinion out of her mind and require the State to prove the defendant guilty. The First Circuit found that the challenges for cause had been properly denied. See also, State v. Collins, 546 So.2d 1246, 1252-53 (La.App. 1st Cir.1989), writ denied, 558 So.2d 599 (La. 1990).
In the instant case, the prospective juror first testified that he wanted to hear the defendant testify. After further explanation and questioning by the trial court, the juror stated that he understood the applicable law. Thus, the trial court did not abuse its great discretion in finding that the juror had been rehabilitated. Accordingly, this assignment is without merit.

ASSIGNMENT OF ERROR TWO
During cross-examination of Merrick the defense asked him, "[t]o your knowledge, and in Benjamin's state of mind, was he in any fear that Lynn Coleman would kill him?" Merrick answered, "[t]he night before he was kind of shaken but not like he would be killed. He told me, he said, `I am not going back over there.'" The defense objected that Merrick was going outside the question. The trial court overruled the objection and ordered Merrick to finish his answer. Merrick then said, "he saidthe night before he said, `I am not going back over there. That woman is crazy. She shot at me.'" The defense now argues the answer constituted inadmissible hearsay.
When defense counsel questioned Merrick about the victim's state of mind with regard to his fearing the defendant, he opened the door to evidence that the defendant shot at the victim. The witness' answer was clearly responsive to the question. It was not offered to prove the truth of the matter asserted (i.e., that the defendant shot at the victim on a previous occasion) but merely demonstrated the victim's state of mind prior to his death. See State v. Brown, 562 So.2d 868 (La.1990). Furthermore, evidence is not hearsay when it is offered non-assertively to prove that a conversation took place. See State v. Mason, 447 So.2d 1134 (La.App. 1st Cir.1984). Accordingly, this assignment is without merit.

ASSIGNMENTS OF ERROR THREE AND FOUR
In these assignments of error, the defense contends that the sentence was excessive and that the trial court failed to consider the *1361 Sentencing Guidelines in effect at that time. The defendant was sentenced to serve 15 years at hard labor. She argues that under the sentencing guidelines as a first offender she should have received a sentence of 60 to 90 months.
Article I, § 20 of the Louisiana Constitution (West 1977) prohibits the imposition of excessive punishment. A sentence may be reviewed for excessiveness even though it is well within statutory guidelines. La.Code Crim.Proc.Ann. art. 881.2 (West Supp.1994); State v. Cann, 471 So.2d 701 (La.1985). The imposition of a sentence may be unconstitutionally excessive if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless imposition of pain and suffering. State v. Lobato, 603 So.2d 739 (La.1992); State v. Brogdon, 457 So.2d 616 (La.1984), cert. den. Brogdon v. Louisiana, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). To insure adequate review by the appellate court, the record must indicate that the trial court considered factors set forth in the sentencing guidelines. La.Code Crim.Proc.Ann. art. 894.1 (West Supp.1994).
In State v. Smith, 93-0402 (La. 7/5/94); 639 So.2d 237, 240, the Louisiana Supreme Court held that:
(1) while a trial judge must consider the Guidelines, he has complete discretion to reject the Guidelines and impose any sentence which is not constitutionally excessive, but is within the statutory sentencing range for the crime of which a defendant has been convicted, so long as he states for the record the consideration taken in to account and the factual basis for his imposition of that sentence, La.Code Cr.P. art. 894.1; and (2) where the trial judge has considered the Guidelines and imposed a sentence, adequately stating for the record the consideration taken into account and the factual basis for imposition of that sentence, an appellate court is limited to a review of the sentence imposed for constitutional excessiveness, without regard as to whether the trial judge either employed or deviated from the Guidelines. (Emphasis in original).
Thus, while the guidelines must be considered in sentencing, the trial judge has discretion to impose a sentence outside the range suggested if he states for the record adequate reasons for the sentence. Absent a manifest abuse of discretion, the sentence imposed by a trial judge should not be set aside as excessive. State v. Lobato, 603 So.2d at 751.
The trial court clearly stated that it had considered the Sentencing Guidelines, and noted that they suggested the defendant be sentenced between five (5) to seven and a half (7½) years. It also noted that under the facts of the case, the defendant deserved to be sentenced to a longer term. In so doing, it clearly considered Article 894.1 noting the prevalence of aggravating factors and the paucity of mitigating ones.
Once adequate compliance with Article 894.1 has been met, the trial court may consider sentences given in similar cases in determining whether the sentence given in this particular case was excessive. In State v. Harrison, 529 So.2d 78 (La.App. 3d Cir.), writ denied, 533 So.2d 16 (La.1988), the defendants were indicted for first degree murder and armed robbery. However, they pleaded guilty to manslaughter and each was sentenced to twenty-one years at hard labor. The court noted that the defendants had no prior convictions. Prior charges for robbery had been dismissed. The defendants shot the victim in the head without provocation and took his wallet.
The defendant in State v. Grey, 522 So.2d 1216 (La.App. 4th Cir.1988) was convicted of manslaughter and sentenced to twenty years. The defendant shot five times at his alleged attempted assailants as they retreated and killed a young teenage boy who was an innocent bystander. The defendant shot his weapon down a hallway which led to the front porch of an apartment complex. The victim was on the front porch.
The Third Circuit in State v. Maxie, 594 So.2d 1072 (La.App. 3d Cir.), writ denied, *1362 598 So.2d 372 (La.1992), affirmed the defendant's sentence of twenty-one years at hard labor on a conviction for manslaughter. The defendant was twenty-two years of age, had no prior criminal record, and was steadily employed. The defendant shot the victim four times with a .22 caliber semi-automatic rifle over an alleged theft of goods valued at $600 which the defendant never reported as stolen. The court found that the defendant over-responded to the victim's alleged actions. Although the defendant knew that the first bullet struck the victim, he continued to shoot the victim three additional times. In his defense, the defendant stated that he and the victim had quarreled many times and, in fact, the victim was armed with a knife. The defendant testified that the victim threatened him with the knife after defendant fired the first shot. However, the state's witnesses testified that the victim was unarmed.
In State v. Smith, 520 So.2d 1252 (La. App. 5th Cir.), writ denied, 523 So.2d 1320 (La.1988), the defendant was convicted of manslaughter and sentenced to twenty-one years at hard labor. The defendant killed the victim while involved in an altercation with the victim. The defendant stabbed the victim several times.
This Court in State v. Welch, 550 So.2d 265 (La.App. 4th Cir.1989), affirmed the defendant's sentence of eighteen years at hard labor on a conviction of manslaughter. The defendant had originally been indicted for second degree murder but was found guilty of manslaughter after a jury trial. The defendant shot the victim three times at close range, once in the head, arm and shoulder. The defendant thought the victim was trying to steal his cocaine. In affirming the sentence, the court noted that the defendant killed the victim on the slightest provocation and while in the commission of a felony (namely, distribution of cocaine).
The defendant in State v. King, 563 So.2d 449 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990), was initially indicted for second degree murder but was convicted of manslaughter and sentenced to twenty-one years at hard labor. The defendant shot and killed his wife during an argument. The defendant shot the victim in the face at close range. This conviction was the defendant's first felony conviction. In affirming the sentence, the court noted that the defendant showed no remorse.
In the instant case, the defendant's sentence was not excessive. She knew the victim; not only was he her lover but the two in fact lived together. The defendant shot the victim at close range because he was beating (knocking) on her trailer. He was unarmed. The trial court further noted that the defendant intentionally and coldly murdered Benjamin Franklin and was very fortunate not to have been convicted of second degree murder. Lastly, the trial court noted that not only did the defendant not claim responsibility for her actions but also she failed to show any remorse. Accordingly, this assignment is without merit.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
SCHOTT, C.J., concurs in the result.