TERRI F. LOVE, Judge.
|, Defendant Christopher R. Cyrus was charged as follows: Count One — aggravated burglary, a violation of La. R.S. 14:60; Count Two — simple burglary of an inhabited dwelling, a violation of La. R.S. 14:62.2; Count Three — aggravated burglary;
*556 Count Four — aggravated burglary; and Count Five — simple burglary of an inhabited dwelling. Defendant Cyrus pled not guilty at his arraignment. In respective competency hearings, Defendant Cyrus was found incompetent to proceed, but in subsequent hearings, he was declared competent to proceed.
Defendant Cyrus filed a motion to suppress the identification which was denied by the trial court.
A motion in limine to exclude evidence was filed by Defendant Cyrus, but was denied, in part, by the trial court. This Court denied Defendant Cyrus’ application for supervisory review of that ruling.[1] Trial by a twelve-person jury commenced regarding Counts Three and Four, each charging one count of aggravated burglary. Defendant Cyrus was found not guilty as charged as to Count Three and guilty as to Count Four.
|gThe trial court denied Defendant Cyrus’ motion for post-verdict judgment of acquittal as to his aggravated burglary conviction in Count Four, and subsequently sentenced him to twenty-five years at hard labor. Defendant Cyrus pled guilty to being a habitual offender as to Count Four, and the trial court vacated the original sentence and resentenced him to the same sentence previously imposed — twenty-five years at hard labor.
Defendant Cyrus also pled guilty to Count One, aggravated burglary, and Counts Two and Five, both counts charging simple burglary of an inhabited dwelling, and was sentenced to twenty-five years at hard labor on Count One, and twelve years at hard labor on each count as to Counts Two and Three. In the same proceeding, Defendant Cyrus pled guilty to being a third-felony habitual offender as to Counts One, Two and Five. The trial court vacated the original three sentences imposed as to those counts and resen-tenced Defendant Cyrus to the same sentences previously imposed — twenty-five years at hard labor on Count One, and twelve years at hard labor on each count as to Counts Two and Five. All sentences were to run concurrently and with any other sentences.
Defendant Cyrus filed an appeal, and after review, we affirm his conviction and sentences for the reasons to follow.
FACTS
New Orleans Police Department Detective Jeff Keating testified that he investigated an aggravated burglary that occurred at 831 Olga Street, at approximately 7:30 a.m. The victim was Dr. Daniel Hogan. The victim’s automobile, a Jaguar, which was later recovered, his handgun and three hundred ($300.00) in cash were taken during the burglary. Det. Keating testified that unsuccessful attempts were made to obtain latent fingerprints from the victim’s ] .^residence and his car. Dr. Hogan assisted in developing a computer-generated composite sketch of the perpetrator, a copy of which was identified by Det. Keating and was introduced into evidence. Defendant Cyrus was developed as a suspect. Det. Keating stated that upon comparing a photograph of Defendant to the composite sketch, he noticed very similar facial characteristics.
While at the scene of Dr. Hogan’s aggravated burglary, Det. Keating learned of another aggravated burglary that occurred approximately two blocks away on Taft Place at approximately 5:20 a.m. on the same morning. The detective subsequently compiled a six-photo lineup and displayed separate lineups to Dr. Hogan and *557 Michele Landry, the victim of the Taft Place burglary. As a result, the detective secured arrest warrants for Defendant Cyrus for the two aggravated burglaries.
Det. Keating confirmed on cross-examination that Defendant Cyrus was never found in possession of any property stolen from Olga Street, and that when he was arrested, he did not have a gun on his person. Det. Keating testified that Defendant Cyrus’ height and weight on the front sheet of his report were provided by Defendant Cyrus. When asked on cross-examination whether he ever tried to rule out any other possible suspects, Det. Keat-ing replied that he had no other suspects.
During cross-examination, Det. Keating replied in the affirmative when defense counsel asked whether, during the course of his investigation, he recovered a black sweatshirt near the recovery site of Dr. Hogan’s car. Det. Keating confirmed that the sweatshirt was collected as evidence. Det. Keating replied in the affirmative when defense counsel asked whether the reason he put the sweatshirt into evidence was because he thought perhaps the individual who had |4stolen the car may have been wearing it and thrown it down. He confirmed that he never had that sweatshirt tested for hairs or DNA.
Michelle Landry, the victim of the aggravated burglary on Taft Place, testified regarding the circumstances of the burglary at her residence. She confirmed that after being confronted by the intruder in her bedroom in the early morning darkness, and after fleeing out of a window and running down the street frantically knocking on doors seeking assistance, and finally being let into a neighbor’s residence, she told a 911 operator that the perpetrator was wearing a mask. However, she testified that what she meant was that the perpetrator had a hood that covered the sides of his face; there was nothing eover-ing the front of his face. Ms. Landry identified the six-photo lineup presented to her by Det. Keating, and pointed out the photo she identified. She said she made her identification in seconds. Det. Keating asked her over and over again if she was certain, and she kept saying yes, she was.
Ms. Landry admitted on cross-examination that she had come into the courtroom earlier that morning and sat down. When asked on redirect examination whether coming into the court earlier that morning had affected her testimony in any way, she replied: “Yeah¡ No. It — helped it. Cause I was very sure when I walked in the courtroom what I saw.”
Dr. Daniel Hogan testified that at approximately 7:20 on the morning of the burglary, he went out the back of his residence through his kitchen door, closing it but leaving it unlocked, to retrieve his newspaper from the front of his residence. He returned inside to find an individual he identified in court as Defendant Cyrus, standing four to five feet away behind the refrigerator in his sunlit kitchen, pointing a gun at him. Nothing was covering the man’s face. Defendant Cyrus [shad a hoodie on and, underneath the hoodie, he was wearing what Dr. Hogan described as a “skull” cap. Dr. Hogan asked Defendant Cyrus “what in the hell” he was doing there. Defendant Cyrus demanded the keys to Dr. Hogan’s Jaguar, which was parked underneath his post-Hurricane Katrina raised home. Dr. Hogan said he kept staring at Defendant Cyrus, focusing on his eyes, hoping that his eyes would give him some inclination of what he was going to do. Dr. Hogan’s car keys were inside his briefcase, which was located in his office at the front of his cottage. He walked down the hallway to his office, with Defendant about three feet behind him, pointing the gun at him. When Dr. Hogan got to his office he picked up his car keys *558 and turned around to face Defendant Cyrus, again looking at him very closely.
Dr. Hogan told Defendant Cyrus he would give him the car keys outside, so Defendant walked him back through the residence, out the back door and up the path to the front of the residence. Dr. Hogan gave Defendant Cyrus the car keys, facing him directly, again getting a good look at him. When Defendant Cyrus drove away in the car, Dr. Hogan went inside and called 911. After the police arrived and had been there approximately fifteen minutes, they received a call that Dr. Hogan’s car had been recovered. Dr. Hogan went with Det. Keating to the scene. He subsequently went to police headquarters, where he assisted in preparing a computerized composite sketch. Dr. Hogan was later shown a photo lineup in which he said he immediately made an identification. Dr. Hogan was asked on redirect examination whether he saw the person in court who held him up at gunpoint. Dr. Hogan responded, “Sure do. It’s him right there.”
On cross-examination, when asked whether he had described the perpetrator as between five feet and five feet, five inches tall, Dr. Hogan replied that he did not | ¿recall that at all. He said Defendant Cyrus was shorter than he was, at six feet, that Defendant Cyrus was more like five feet nine or ten inches tall. On redirect examination, when Dr. Hogan was asked whether there was any doubt in his mind that Defendant Cyrus was the individual who held him up, Dr. Hogan replied: “No doubt at all.”
New Orleans Police Officer Arthur Cleveland confirmed that he noted in his report that Dr. Hogan reported the perpetrator’s height as five feet five inches, with a weight of one hundred sixty pounds. The bulletin put out for the perpetrator had his weight listed as one hundred fifty pounds.
Mary Woods, a New Orleans Police Department Communications 911 call supervisor, identified incident calls for the aggravated burglary at 831 Olga Street, Dr. Hogan’s residence, and 963 Taft Place, Michelle Landry’s residence. The initial description given by Ms. Landry was a possible black or Hispanic male, short, wearing a mask and dark clothing. The initial description given by Dr. Hogan was of a black male, fourteen to twenty years of age, five feet five inches tall, gray hooded sweatshirt, black cap or “skull” cap and blue jeans.
During the audio recording of her 911 call, when the 911 operator asked if the perpetrator was white or black, Ms. Landry said she did not know, he “had a mask” and dark clothes.
Mary Gibbons, an investigator with the Orleans Parish Indigent Defender’s Office, measured Defendant Cyrus’ height in open court, with and without his shoes on. She subsequently testified that Defendant Cyrus was approximately six feet one inch tall in his shoes, and six feet tall with his shoes off.
^ERRORS PATENT
A review of the record reveals errors patent on the face of the record as to the sentences imposed for Defendant Cyrus’ separate convictions in Counts Two and Five, for simple burglary of an inhabited dwelling, violations of La. R.S. 14:62.2.
The trial court originally sentenced Defendant Cyrus to twelve years at hard labor on each count, the maximum sentence under La. R.S. 14:62.2. Defendant Cyrus then pled guilty to being a third-felony habitual offender as to those two convictions. The trial court vacated the original sentences and resentenced him as *559 a third-felony habitual offender to twelve years on each count, one-half the maximum under the Habitual Offender Law, more specifically, La. R.S. 15:529.1(A)(3)(a).
However, the trial court failed to require — in imposing both the original sentences on the two convictions for simple burglary of an inhabited dwelling as well as the enhanced sentences as a third-felony habitual offender for those two convictions — that the first year of each sentence be served without the benefit of parole, probation, or suspension of sentence, as required by La. R.S. 14:62.2.[2] Louisiana Revised Statutes 14:62.2 provides that the first year of the sentence should be ordered to be served without benefit of parole, probation, or suspension of sentence, and a defendant’s adjudication as a triple offender does not affect the requirement that the first year is to be served without benefit of parole, probation, |Ror suspension of sentence. See State v. Allen, 618 So.2d 547, 549 (La.App. 4 Cir.1993).
Additionally, the trial court did not require that each sentence be served without the benefit of probation or suspension of sentence, as required by La. R.S. 15:529.1(G) of the Habitual Offender Law. State v. Graps, 2009-1202, p. 9 (La.App. 4 Cir. 6/23/10), 42 So.3d 1066, 1071. Thus, both the original and third-felony habitual offender sentences imposed for both convictions for simple burglary of an inhabited dwelling were illegally lenient.
The errors as to the original sentences are moot, given that they were vacated after Defendant Cyrus’ adjudication, and before his resentencing, as a habitual offender. None of the errors requires action by this Court because La. R.S. 15:301.1(A) deems that those required statutory restrictions are contained in the sentence, whether or not imposed by the sentencing court. La. R.S. 15:301.1(A) self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence resulting from the failure of the sentencing court to impose the restrictions. State v. Williams, 2000-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799; State v. Boudreaux, 2007-0089, pp. 3-4 (La.App. 4 Cir. 8/15/07), 966 So.2d 79, 81-82.
Additionally, Defendant Cyrus was charged in Count Four with, and convicted of, committing an aggravated burglary at 831 Olga Street, wherein he was armed with a dangerous weapon. This is the only offense to which Defendant Cyrus’ two assignments of error pertain. However, he was tried for this offense, Count Four, together with Count Three, another charge of aggravated burglary, as to which the jury returned a verdict of not guilty. Evidence as to both counts is preferred to by Defendant Cyrus and the State in their respective appellate briefs. Therefore, we will reference the evidence regarding Count Three.
LAW AND DISCUSSION

Assignment of Error No. 1

Motion to Suppress Identifications

Defendant Cyrus argues the “[t]he trial court erred denying the motion to suppress the identifications made during the trial.” He further argues that the testimony at the suppression hearing and at trial demonstrates that the identification procedure was unduly suggestive and re- *560 suited in the substantial likelihood of mis-identification. There was no motion to suppress the identification made during the trial proceeding. Thus, Defendant Cyrus’ assignment of error is that the trial court erred in denying his pretrial motions to suppress the identifications. Also, Defendant Cyrus was only convicted in Count Four, the aggravated burglary of Dr. Hogan’s residence. Therefore, this assignment of error as to the trial court’s denial of his motion to suppress the identification concerns only the identification made by Dr. Hogan.
A trial court’s determination of the admissibility of identification evidence is entitled to great weight and will not be disturbed in the absence of an abuse of discretion. State v. Stovall, 2007-0343, p. 17 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074, 1085.
The defendant bears the burden of proving that an out-of-court identification was suggestive and that there was a substantial likelihood of misidentifieation as a result of the identification procedure. State v. Ballett, 98-2568, p. 17 (La.App. 4 Cir. 3/15/00), 756 So.2d 587, 597; State v. Martello, 98-2066, p. 8 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1198. A defendant must first prove that the | ^identification was suggestive. State v. Thibodeaux, 98-1673, pp. 20-21 (La.9/8/99), 750 So.2d 916, 932. An identification procedure is suggestive if it “unduly” focuses attention on the defendant. State v. Moore, 2010-0314, p. 8 (La.App. 4 Cir. 10/13/10), 57 So.3d 1033, 1039, writ denied, 2011-0404 (La.9/2/11), 68 So.2d 525.
In addition to suggestiveness, a defendant must prove that there was a substantial likelihood of misidentifieation as a result of the identification procedure. State v. Robinson, 2009-0922, p. 3 (La.App. 4 Cir. 3/10/10), 50 So.3d 158, 161.
Despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a “very substantial likelihood of irreparable mis-identification.” Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977); State v. Leger, 2005-0011, p. 59 (La.7/10/06), 936 So.2d 108,151. Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentifieation include: 1) the witness’ opportunity to view the criminal at the time of the crime; 2) the witness’ degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.
However, a defendant must make a threshold showing that an identification is suggestive before the reliability of the identification becomes relevant. Bou-dreaux, supra.
In the instant case, Defendant Cyrus notes that his photo is patently different from the other five photos in the six-photo lineup in which Dr. Hogan identified | nDefendant Cyrus’ photo. Defendant Cyrus characterizes the difference as a “different focus.” The photo of Defendant Cyrus, specifically, his face/head, is markedly larger, in both length and width, than the photos of the other five males, and Defendant Cyrus is correct that the focus of his photo is different from the other five photos. Defendant’s photo appears slightly out of focus compared to the other photos, and the shading is different. It is not unreasonable to characterize the differences as unduly focusing attention Defendant Cyrus’ photo. Therefore, arguably, the photo lineup was suggestive, thus *561 triggering consideration of the reliability of Dr. Hogan’s identification of Defendant Cyrus’ photo.
Dr. Hogan did not testify at the hearing on the motion to suppress the identification. Only Det. Keating testified at that hearing as to the identification procedures, including the one in which Dr. Hogan identified Defendant Cyrus’ photo. Nothing in the transcript of the hearing on the motion to suppress the identification warranted a finding that Defendant Cyrus had met his burden of proving that the identification was both suggestive and unreliable. However, in reviewing a defendant’s claim that the trial court erred in denying a motion to suppress an identification, an appellate court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Williams, 2010-1197, p. 10 (La.App. 4 Cir. 5/25/11), 66 So.3d 1207, 1213, writ denied, 2011-1281 (La.2/3/12), 79 So.3d 1023, citing State v. Lewis, 2004-0227, p. 18 (La.App. 4 Cir. 9/29/04), 885 So.2d 641, 652.
Considering the five Manson factors, the evidence adduced at trial, as well as at the motion to suppress hearing, it cannot be said that the trial court abused its discretion in finding that the identification made by Dr. Hogan was reliable. Even Defendant Cyrus concedes in his brief that Dr. Hogan had “ample opportunity” to | i;.view the perpetrator. Second, Dr. Hogan testified that upon first encountering the Defendant Cyrus in his sunlit kitchen, he kept staring at him, focusing on his eyes. Dr. Hogan also testified that when he and Defendant Cyrus got to his office and he picked up his car keys, he turned around to face Defendant Cyrus, looking at him very closely. Finally, Dr. Hogan, who did not give Defendant Cyrus his car keys until they were outside the residence, testified that when he gave Defendant Cyrus his car keys outside, he faced him directly, getting a good look at him.
While Defendant Cyrus remarks that Officer Cleveland, the initial officer to arrive on the scene, testified that Dr. Hogan described the perpetrator as between five feet and five feet five inches tall, while Defendant actually is approximately six feet, one inch tall in shoes, it is to be noted that Dr. Hogan never testified that he paid attention to Defendant Cyrus’ height. Dr. Hogan testified that he did not recall ever describing the perpetrator as so short. The photo lineup in which Dr. Hogan identified Defendant Cyrus contained only facial photos; height was not a factor in Dr. Hogan’s identification.
Officer Cleveland also testified that Dr. Hogan described the perpetrator as weighing one hundred sixty pounds. Thus, Defendant Cyrus argues that the person described by Dr. Hogan to Officer Cleveland was “not thin.” Defendant Cyrus states that he weighs one hundred sixty pounds, and “is relatively thin,” although there was no evidence introduced at trial as to Defendant’s actual weight or as to the fact that he was relatively thin. Dr. Hogan correctly estimated Defendant’s weight, but possibly not his height.
Dr. Hogan testified that he immediately made an identification when Det. Keating presented him with the photo lineup. Dr. Hogan made his identification on the same day he was confronted by Defendant Cyrus.
11sThere is no merit to this assignment of error.

Assignment of Error No. 2

Hearsay Testimony on Direct Examination

In his second assignment of error, Defendant Christopher Cyrus argues that the trial court erred in permitting Det. Keat- *562 ing to give hearsay testimony on redirect examination that an unnamed individual identified Defendant Cyrus as the person the unnamed individual observed the morning of the burglary exit Dr. Hogan’s stolen Jaguar with a gun in his hand. Defendant Cyrus also asserts the trial court erred in denying his motion for mistrial based upon that alleged error.
During the State’s direct examination of Det. Keating, it was revealed that Dr. Hogan’s stolen Jaguar was found at Annette and N. Rocheblave Streets, and that it was unsuccessfully processed for latent fingerprints.
During defense counsel’s cross-examination of Det. Keating, he was asked if he, in the course of his investigation, had recovered a black sweatshirt near the recovery location of Dr. Hogan’s car. The detective confirmed that the sweatshirt was collected as evidence because he thought maybe the person who had stolen the car may have been wearing it and thrown it down; and, lastly, that he never had that sweatshirt “tested for hairs, DNA, any evidence like that.”
On redirect examination of Det. Keating, the State directed the detective’s attention to defense counsel having asked him about the sweatshirt. The State asked the detective if the defense had asked him if the reason he put the sweatshirt into evidence was because he thought the person who may have been wearing it could have been the person who committed the crimes. Defense counsel lodged a leading question objection, which was overruled. The State then asked Det. Keating why he had thought that the person who had been wearing the sweatshirt 114could have been the person who committed the crimes. Defense counsel objected, stating no ground, and asked to approach the bench, to which the trial court responded, “No.” Defense counsel uttered, “Your honor,” to which the trial court replied, “Overruled.” Det. Keating had begun to answer the State’s question, “Because an individual seen exiting — ,” when defense counsel objected, again stating no ground, and asking to approach the bench. The trial court did not respond to this objection or to the request to approach, and Det. Keating continued with his answer, stating that he did it because an individual was seen exiting from Dr. Hogan’s Jaguar with a handgun in his hand, “walking down that street, where a black male was observed discarding a black sweat shirt.”
The State then asked, “And did they — ,” whereupon the defense lodged a hearsay objection before the State concluded its question, “identify that person as Christopher Cyrus?” The trial court interrupted the questioning, asking defense counsel what the objection was and to which question it was directed. Defense counsel again asked to approach the bench, but the trial court stated that there was no need to approach, and asked the State to repeat its question. The State phrased the question as whether “they” were able to identify the person who exited Dr. Hogan’s Jaguar. The trial court asked if the defense had an objection. Defense counsel replied affirmatively. The trial court then asked the basis of the objection, and the defense replied, “Hearsay,.... An out-of-court statement offered for the truth of the matter asserted.” The trial court overruled the objection, and Det. Keating answered: ‘Yes, ma’am. That individual also identified that individual exiting from Mr. — Dr. Hogan’s vehicle in possession of a handgun as Mr. Christopher Cyrus.”
|1aOn recross-examination, the defense redirected Det. Keating regarding the issue of the sweatshirt and asked him if the individual who saw the sweatshirt being thrown to the ground was a Mr. Montegut. Det. Keating confirmed that fact, and he *563 also confirmed that Mr. Montegut did not see the individual who discarded the sweatshirt inside Dr. Hogan’s Jaguar. Det. Keating stated that Mr. Montegut did not have a view of the intersection, so all he observed was a black male taking a sweatshirt off and discarding it to the ground. Det. Keating confirmed that Mr. Montegut did not participate in any identification procedures. Defense counsel then asked the detective:
Q So, I mean, you testified that he identified Christopher Cyrus; but that’s not true, correct?
BY MS. BERTHELOT:
Objection, judge. That’s a mischarac-terization. He never said—
BY THE COURT:
Overruled.
BY MS. BERTHELOT:
—Mr. Montegut.
BY THE COURT:
Overruled. You can answer it.
BY THE WITNESS:
Mr. Montegut did not identify Mr. Cyrus. Another individual identified Mr. Cyrus exiting the stolen Jaguar at the intersection [sic] Annette and North Rocheblave Street wit [sic] handgun. That individual was the individual—
BY MS. GARVEY:
. Your Honor—
BY THE WITNESS:
—who identified Mr. Cyrus.
BY THE COURT:
You asked the question. Do you have any other questions?
11fiDefendant Cyrus argues that permitting Det. Keating to testify as to the alleged hearsay statement of an unidentified individual — who did not testify at trial and who was never subject to cross examination by Defendant in any proceeding, and who was not shown to be unavailable as a witness — identifying Defendant Cyrus as the person seen exiting Dr. Hogan’s vehicle violated his rights under the United States Constitution’s Sixth Amendment Confrontation Clause, which provides, in pertinent part, that, “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.”
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354,158 L.Ed.2d 177 (2004), the Court held that the admission of “testimonial” hearsay evidence violates the Sixth Amendment’s Confrontation Clause. The hearsay the Court found testimonial was a recorded statement given by the defendant’s wife to police after she had been advised of her Miranda rights. The statement was introduced by the State to rebut the defendant’s claim of self-defense in a stabbing case in which he was charged with assault and attempted murder. Defendant and his wife were each interrogated twice by police. The wife did not testify because of the state marital privilege, and the defendant had no other opportunity to cross examine her. The Court in Crawford left “for another day any effort to spell out a comprehensive definition of ‘testimonial,’ ” but stated that “[w]hatever else the term covers, it applies at a minimum to ... police interrogations.” Crawford, 541 U.S. at 68,124 S.Ct. at 1374.
The Court stated in Crawford that “even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officer fall squarely within that class.” Crawford, 541 U.S. at 53, 124 S.Ct. at 1365. The Court noted in a footnote to that 117statement that it used the term “interrogation” in its colloquial, rather than any technical legal, sense, and that, as with the term “testimonial,” one could “imagine various definitions of ‘interrogation.’ ” Id.
*564 In Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.E.2d 224 (2006), the Court had to determine whether a recording of a 911 call from a victim of domestic violence was testimonial within the meaning of Crawford. The 911 operator first asked the caller what was going on, to which the caller responded that “he [sic] here jumpin’ on me again.” 547 U.S. at 817, 126 S.Ct. at 2271. The 911 operator asked if there were any weapons, and the caller said “No. He’s [sic] usin’ his fists.” Id. The 911 operator asked the caller, in three successive questions, if she knew, first, the perpetrator’s last name, second, his first name, and third, his middle initial. In response to each respective question the caller gave the operator the defendant’s last, first, and full middle names. The defendant was charged with, and convicted of, a felony violation of a domestic no-eontact order. The only witnesses presented by the State were the two responding police officers, who both testified that the victim exhibited injuries that appeared to be recent. However, neither officer could testify as to the cause of the injuries.
The issue in Davis was whether, “objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements” as contemplated by Crawford. 547 U.S. at 826, 126 S.Ct. at 2276. In its analysis in Davis, the Court noted that when it had stated in Crawford that interrogations by law enforcement fall squarely within the class of testimonial hearsay with which the Sixth Amendment was concerned, the Court “had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. |1sThe product of such interrogation is testimonial.” Davis, 547 U.S. at 826, 126 S.Ct. at 2276.
The Davis Court noted that the domestic violence victim who called 911 in that case was speaking about events as they were actually happening, rather than describing past events, while the interrogation of the defendant’s wife in Crawford took place hours after the events she described had occurred. Moreover, the Court noted, any reasonable listener would recognize that the domestic abuse victim in Davis was facing an ongoing emergency, and that her call was plainly a call for help against a bona fide physical threat. The Court stressed that the nature of the questions asked by the 911 operator in Davis, “viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past.” Davis, 547 U.S. at 827, 126 S.Ct. at 2276 (emphasis in original). The Court said this was true even of the 911 operator’s effort to establish the identity of the assailant, so that dispatched officers might know whether they would be encountering a violent felon. Finally, the Court noted that the differences in the level of formality between the two interviews were striking. The defendant’s wife in Crawford was responding calmly at the police station to a series of questions, with the officer-interrogator taping and making notes of her answers, while the 911 caller’s frantic answers in Davis were provided over the telephone, in an environment that was not tranquil, or even safe, insofar as any reasonable 911 operator could have ascertained.
The Davis court concluded that the circumstances of the 911 caller’s interrogation objectively indicated that its primary purpose was to enable police assistance to meet an ongoing emergency. “She simply was not acting as a 119witness; she was not testifying.... No ‘witness’ goes into court to proclaim an emergency and seek *565 help.” (emphasis in original), Davis, 547 U.S. at 828,126 S.Ct. at 2277.
The State presents several arguments, the first to be addressed is its contention that the testimony by Det. Keating that an unnamed individual identified Defendant Cyrus as the person seen exiting Dr. Hogan’s vehicle was not hearsay because it was not offered for the truth of the matter asserted, but to explain Det. Keating’s actions. The State argues that the Confrontation Clause does not bar the use of testimonial statements for non-hearsay purposes, that is, for purposes other than establishing the truth of the matter asserted, correctly citing Crawford itself for that proposition—“[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.” Crawford, 541 U.S. at 59,124 S.Ct. at 1369.
The State argues that if the identification of Defendant Cyrus by the unnamed witness as the person seen exiting Dr. Hogan’s vehicle had been made shortly after Defendant was seen by that unnamed witness, Det. Keating’s testimony concerning the identification “could very well be said to have been made ‘for the primary purpose ... to enable police assistance to meet an ongoing emergency,’ ” citing and quoting Davis, 547 U.S. at 822, 126 S.Ct. at 2273. Thus, the State is likening what the unidentified witness told Det. Keating about Defendant being the person seen exiting Dr. Hogan’s Jaguar to information furnished by a citizen to a 911 operator to meet an ongoing emergency, in which case, under Davis, it would be non-testimonial and thus has no confrontation impact. The State argues that it appears the identification by the unnamed witness was made before Defendant Cyrus was arrested. However, the record does not | gpclearly reflect the timing of the unnamed witness’ identification of Defendant Cyrus as the person exiting Dr. Hogan’s Jaguar. Therefore, it cannot be said that the identification of Defendant Cyrus as the person seen exiting Dr. Hogan’s Jaguar was furnished to Det. Keating to meet an ongoing emergency.
Defense counsel’s objection to Det. Keating testifying that an unidentified individual identified the person seen exiting Dr. Hogan’s car as Defendant, was based on Defendant Cyrus’ assertion that Det. Keating’s answer was hearsay. That objection was overruled. Thus, an initial issue is whether the trial court erred in overruling that hearsay objection—whether the testimony was, in fact, hearsay. For the following reasons, we find the testimony was not hearsay, and therefore, the trial court did not err in overruling the hearsay objection or in denying the motion for mistrial.
A trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. State v. Richardson, 97-1995, p. 14 (La.App. 4 Cir. 3/3/99), 729 So.2d 114,122.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C); Moore, 2010-0314, p. 4, 57 So.3d at 1037. A statement is an oral or written assertion, or nonverbal conduct of a person, if it is intended by him as an assertion. La. C.E. art. 801(A). Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; Moore, supra.
In certain circumstances, the testimony of a police officer may encompass information provided by another individual without constituting hearsay if offered to explain the course of the police investiga *566 tion and the steps leading to the 121 defendant’s arrest. See State v. Smith, 400 So.2d 587, 591 (La.1981); State v. Calloway, 324 So.2d 801, 809 (La.1976); State v. Monk 315 So.2d 727, 740 (La.1975). However, the Louisiana Supreme Court has warned that the State should not be allowed to use an officer as a “passkey” to present inadmissible hearsay evidence to the jury in the guise of “explaining police actions.” State v. Hearold, 603 So.2d 731, 737 (La.1992); see also State v. Broadway, 96-2659 p. 8 (La.10/19/99), 753 So.2d 801, 809 (“[T]he fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant’s guilt that would otherwise be barred by the hearsay rule.”); State v. Wille, 559 So.2d 1321,1331 (La.1990).
In Wille, supra, the Louisiana Supreme Court held that an FBI agent’s testimony concerning statements given to him by two female witnesses/accomplices (who did not testify) concerning evidence of the defendant’s involvement in the kidnapping, rape, beating and strangulation of an eight-year-old girl, and the identification of the victim by one of the witnesses/accomplices, was erroneously admitted over the hearsay objections of defense counsel. The agent had testified to these matters in the course of detailing his investigation and his ultimate focus on the defendant as the prime suspect in the murder, to the extent that he was certain the defendant was responsible. Wille, 559 So.2d at 1329. The Court rejected the State’s argument that the testimony of the FBI agent was non-hearsay because it was offered not to prove the truth of the matter asserted, but to explain how law enforcement authorities came to identify the defendant as the suspect in the crime. The Court noted that there was no true issue in the case as to the propriety of any action taken by the FBI agent during the |22murder investigation, and that the real purpose of his testimony was to place before the jury the fact that the two witness/accomplices’ statements had named the defendant as the killer. The Court further noted that the value of the statements rested upon the credibility of the out-of-court assertions.
In the instant case, the State did not elicit any testimony from Det. Keating on direct examination concerning anyone having been seen exiting Dr. Hogan’s Jaguar. The only testimony elicited by the State on direct examination concerning Dr. Hogan’s vehicle was its make, the details of its theft from Dr. Hogan during the aggravated burglary of his residence, the recovery of the vehicle at Annette and N. Rocheblave Streets, and that police unsuccessfully attempted to obtain latent fingerprints from the vehicle.
On cross-examination, the defense elicited from Det. Keating, through leading questions, that a sweatshirt was recovered near where Dr. Hogan’s Jaguar was found; that he thought the person who had stolen the car may have discarded the sweatshirt; and, that he never had the sweatshirt tested for hairs, DNA, “or any evidence like that.”
On redirect examination, the State asked Det. Keating why he thought the person who had been wearing the discarded sweatshirt could have been the person who committed the crimes. Over two defense objections, neither stating any ground therefore, Det. Keating stated that he thought so because someone was seen exiting Dr. Hogan’s Jaguar with a handgun in his hand and walking down the street, where a black male was observed discarding a black sweatshirt.
This answer by Det. Keating was sufficient to address the issue raised on cross-examination by defense counsel as to why *567 the detective thought a person seen exiting the stolen car may have discarded the sweatshirt. The State proceeded |¾⅜0 ask whether the unnamed witness who saw the person exiting the Jaguar was able to identify that person. Defense counsel objected on hearsay grounds, but the trial court overruled the objection. Det. Keating then stated that the unnamed witness identified the person exiting the Jaguar in possession of a handgun as Defendant Cyrus.
The State’s elicitation from Det. Keating that an unnamed witness identified defendant as the individual seen exiting Dr. Hogan’s Jaguar with a gun in his hand was not offered for the truth of the matter asserted, but to explain the course of Det. Keating’s investigation. The truth of the out-of-court statement/assertion — the identification of Defendant Cyrus as the person seen exiting the Jaguar — was irrelevant. The relevancy of the statement was the impact of the identification on the course of Det. Keating’s investigation, regardless of the accuracy of the matter asserted— the fact of the identification. Part of Det. Keating’s investigation was his decision not to have the sweatshirt tested for hairs, DNA, etc. One reason for that decision made in the course of his investigation was that the unnamed witness had identified Defendant Cyrus as the person seen exiting Dr. Hogan’s car. This information, together with the identifications of Defendant by Dr. Hogan and Michelle Landry, was sufficient. Therefore, Det. Keating’s testimony was not offered for the truth of the matter asserted but to explain the course of his investigation. Accordingly, the testimony was not hearsay.

State’s Use of Admissible Nonhearsay Testimony in Closiny Aryument

While Defendant Cyrus asserts in brief that during the State’s closing argument, the State argued, over defense objections,
that Det. Keating “had another eyewitness” who saw Defendant Cyrus get out of “a” Jaguar at Annette and N. Roeheblave Streets with a gun in his hand, Defendant Cyrus raises this point in ^arguing that such argument by the prosecutor “makes clear the prosecutor’s intent.” Although the State may have improperly exploited the admissible nonhearsay testimony for the truth of the matter asserted during closing argument, the trial court’s initial determination that the evidence was not hearsay is not rendered erroneous, and it does not suggest that the prosecutor sought to get the evidence before the jury in order to exploit it for the truth of matter asserted. Moreover, Defendant Cyrus raises no assignment of error that the trial court erred in overruling his objections to the State’s closing argument.

Defense “Opened the Door” to Testimony

During the hearing on Defendant Cyrus’ motion for mistrial, the trial court stated that it was denying the motion. The court found that by inquiring during the cross-examination of Det. Keating about the issue of the sweatshirt, the detective’s belief that it might have been discarded by the person who exited the Jaguar, and Det. Keating’s decision as part of his investigation not to have the sweatshirt tested for hairs, DNA, the defense had “opened the door” for the State to bring out the information about the unnamed witness identifying Defendant Cyrus as the person who exited the Jaguar.
In State v. Coleman, 94-0666 (La.App. 4 Cir. 12/15/94), 647 So.2d 1355, defense counsel asked a witness on cross examination whether the victim of the homicide at issue had been in any fear that the defendant would kill him. The witness replied that the night before (presumably the night before the killing), the victim was kind of shaken, saying to the witness: “I am not going back over there. That worn- *568 an is crazy. She shot at me.” Coleman, 94-0666, p. 9, 647 So.2d at 1360. On appeal, defendant argued that the testimony by the witness constituted inadmissible hearsay. This court held that when defense counsel questioned the | ^witness on cross examination about the victim’s state of mind with regard to his fearing the defendant, counsel “opened the door” to evidence that the defendant had previously shot at the victim. Addressing the hearsay argument on appeal, this court noted that the witness’ answer was clearly responsive to the question, and that it was not offered to prove the truth of the matter asserted (that the defendant shot at the victim on a previous occasion), but merely demonstrated the victim’s state of mind prior to his death.
In the instant case, Det. Keating twice testified that the unidentified witness had identified Defendant Cyrus as the person who exited Dr. Hogan’s car. The first time was on redirect examination, as discussed. The second time was during defense counsel’s recross-examination of Det. Keating, as set forth in the colloquy previously quoted. Det. Keating’s testimony in this instance about the unnamed witness identifying Defendant Cyrus was a direct response to a question by the defense, who first stated that Det. Keating had testified that a Mr. Montegut had identified Defendant Cyrus, but that was not true. Det. Keating replied that Mr. Montegut (apparently the witness who saw a black male discard the sweatshirt, but who never participated in any identification procedure), did not identify Defendant Cyrus, that another individual had identified defendant as exiting the stolen Jaguar. Although the defense voiced a “Your Honor — ,” it was done after Det. Keating had stated the objectionable words. The trial court subsequently told defense counsel, “You asked the question.” Thus, in denying the motion for mistrial, the trial court was correct in stating that the defense had “opened the door” to Det. Keating’s second utterance of the identification of Defendant Cyrus by the unnamed witness.
1 a,However, as previously explained, we find the original testimony by Det. Keating regarding the unnamed witness identifying Defendant Cyrus getting out of Dr. Hogan’s Jaguar was not hearsay. The second utterance of that information by Det. Keating under recross-examination by the defense also was not hearsay, but it was cumulative of the first utterance, and thus it cannot be said that it substantially prejudiced Defendant Cyrus.
In the instant case, the objectionable testimony by Det. Keating that Defendant Cyrus had been identified as the person seen exiting Dr. Hogan’s Jaguar at Annette and N. Rocheblave Streets was cumulative to the extent that Dr. Hogan had identified Defendant as the person he witnessed steal his Jaguar car keys from him at gunpoint, enter the Jaguar, and drive off in it. Later that same morning, Dr. Hogan accompanied Det. Keating to the location where the Jaguar had been abandoned. The objectionable testimony was not cumulative to the extent that Defendant Cyrus was identified as the person seen exiting the Jaguar at Annette and N. Rocheblave Streets. However, Defendant Cyrus was not charged with illegally abandoning the Jaguar in the middle of the intersection of Annette and N. Rocheblave Streets, as photographs introduced in evidence show it was. He was charged with and convicted of the aggravated burglary of Dr. Hogan’s residence, in the course of which he stole the vehicle from Dr. Hogan.
As previously discussed, Dr. Hogan had considerable opportunity to observe Defendant Cyrus, and testified that he did so, focusing on Defendant Cyrus’ facial features. The only issue regarding Dr. Ho- *569 gaii’s identification of Defendant Cyrus was testimony by the initial responding police officer that Dr. Hogan described the perpetrator as being between five feet to five feet, five inches tall, while the evidence was that Defendant is six feet, one inch tall in shoes. Dr. Hogan testified [gythat he did not remember describing the perpetrator as so short. The State’s case against Defendant Cyrus for the aggravated burglary of Dr. Hogan’s residence rested entirely on Dr. Hogan’s identification of Defendant Cyrus as the perpetrator.

Perceived Link between Verdicts and the Testimony about Unnamed Witness

Defendant Cyrus argues that the not guilty verdict in the aggravated burglary count involving victim Michelle Landry, and the guilty verdict in Dr. Hogan’s case, can be explained by Det. Keating’s testimony about the unnamed witness identifying Defendant Cyrus as the person seen exiting Dr. Hogan’s Jaguar with a gun in his hand at Annette and N. Roche-blave Streets.
However, the recording of Ms. Landry speaking with the 911 operator showed that she was in an almost hysterical state. She told the 911 operator that the perpetrator in her case was wearing a mask, and she could not even tell the 911 operator whether the perpetrator was white or black when asked. Ms. Landry viewed the perpetrator inside her residence in the early morning darkness. In contrast, Dr. Hogan had a very good opportunity to view the perpetrator in his sunlight-filled kitchen; in the front room of his residence where he obtained his car keys and communicated to defendant that he would not give him the keys until they were outside; and lastly, at the point outside where he gave the keys to defendant and watched him enter his Jaguar and drive off. Dr. Hogan also helped the police artist prepare the computer-generated composite image of the perpetrator, which aided in securing Defendant Cyrus’ arrest.
Dr. Hogan had opportunities to view Defendant Cyrus’ face, and when presented with the photo lineup by Det. Keating, he immediately identified Defendant Cyrus’ photo as the facial photo of the individual who confronted him.
12gln Wills, supra, while the Louisiana Supreme Court held that testimony by an FBI agent as to what two witness/accomplices had told him that led him to become convinced the defendant was the perpetrator of a brutal rape and murder of an eight-year-old girl violated the defendant’s confrontation rights, the court found the error harmless, stating:
As the reviewing court, we conclude there is no reasonable possibility that Agent Harvey’s erroneously admitted testimony, which conveyed undetailed information that two accomplices had named defendant as the perpetrator, contributed to the verdict. The error was harmless beyond a reasonable doubt.
Witte, 559 So.2d at 1338.
Likewise, in the instant case, the evidence establishes that there is no reasonable possibility that Det. Keating’s testimony that an unnamed witness identified Defendant Cyrus as the person seen exiting Dr. Hogan’s car contributed to the verdict. Therefore, any perceived error was harmless beyond a reasonable doubt.

Presumed Confrontation Error

Finally, given that any presumed confrontation error was harmless beyond a reasonable doubt, it cannot be said that the trial court’s failure to grant a mistrial under the general mistrial ground in La. *570 C.Cr.P. art. 775[3] — that prejudicial conduct in the courtroom makes it impossible for the defendant to obtain a fair trial — constituted reversible error.
There is no merit to this assignment of error.
|g9DECREE
After review of the record in light of the applicable law and arguments, we conclude Defendant Christopher Cyrus’ conviction and sentences are affirmed.
AFFIRMED

. State v. Cyrus, unpub., 2011-0086 (La.App. 4 Cir. 1/19/11).

. La. R.S. 14:62.2 states, in pertinent part, that:
Whoever commits the crime of simple burglary of an inhabited dwelling shall be imprisoned at hard labor for not less than one year, without benefit of parole, probation or suspension of sentence, nor more than twelve years.

. La.C.Cr.P. art. 775 states, in pertinent part: Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial,....